[Sac. Nos. 6952-6968. In Bank. Feb. 23, 1961.]

SECURITY-FIRST NATIONAL BANK OF LOS ANGELES (a National Banking Association), Appellant, v. FRANCHISE TAX BOARD OF THE STATE OF CALIFORNIA, Respondent.

(17 Cases)

[Sac. Nos. 6969-6981. In Bank. Feb. 23, 1961.]

BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION (a National Banking Association), Appellant, v. FRANCHISE TAX BOARD OF THE STATE OF CALIFORNIA, Respondent.

(13 Cases)

[Sac. Nos. 6982-6996. In Bank. Feb. 23, 1961.]

THE FARMERS AND MERCHANTS NATIONAL BANK OF LOS ANGELES (a National Banking Association), Appellant, v. FRANCHISE TAX BOARD OF THE STATE OF CALIFORNIA, Respondent.

(15 Cases)

O'Melveny & Myers, Pierce Works, Howard J. Deards, Lawler, Felix & Hall, Brenton L. Metzler, Samuel B. Stewart, Jr., and Hugo A. Steinmeyer for Appellants.

Stanley Mosk, Attorney General, James E. Sabine and Irving H. Perluss, Assistant Attorneys General, Ernest P. Goodman, Deputy Attorney General, and Felix S. Wahrhaftig for Respondent.

GIBSON, C. J.—Plaintiffs, national banking associations, appeal from judgments denying recovery in actions for the refund of taxes imposed under the Bank and Corporation Franchise Tax Act during the years 1933 through 1949. (Stats. 1929, ch. 13, p. 19, as amended; Deering's Gen. Laws, 1944, Act 8488.)[1]

From 1935 through 1949 subdivision 3 of section 4 of the act imposed a franchise tax at the flat rate of 4 per cent of net income upon every corporation except financial corporations and those exempted by the Constitution or the act. The corporations taxable under this provision (hereafter referred to as nonfinancial corporations) were required to pay, in addition, other taxes including personal and real property taxes. Banks and other financial institutions were required to pay as a franchise tax a percentage of net income, not to exceed 8 per cent, made up of two parts: (1) a flat rate of 4 per cent, as paid by nonfinancial corporations, and (2) an additional percentage determined on the basis of the ratio between the total personal property taxes required to be paid by nonfinancial corporations and their total net incomes attributable to California. (§ 4a.) In 1933 and 1934 section 4a provided that the flat rate, like the one then applicable to nonfinancial corporations, was 2 per cent (rather than 4 per cent) and that the combination of the flat rate and addi-

[1]The cases before us, totaling 45, include separate actions by each of the three plaintiffs for each of the taxable years, except that there are no actions for Farmers and Merchants Bank for 1933 and 1934 or for Bank of America for 1933-1935 and 1939. The actions were consolidated for trial.

The act has been codified in the Revenue and Taxation Code as section 23001 et seq., effective July 1, 1951. The cases relate to a period prior to the codification, and, as has been done by the parties, references will be made to sections of the act rather than to the code.

tional percentage should not exceed 6 per cent.[2] The act provides that the tax on the franchise of banks is in lieu of all other state, county, or municipal taxes or licenses except real property taxes. (§ 3.) There is no such provision with respect to other corporations.

National banks, such as plaintiffs, may be taxed by a state only as expressly permitted by Congress. (*Iowa-Des Moines Nat. Bank* v. *Bennett*, 284 U.S. 239, 244 [52 S.Ct. 133, 76 L.Ed. 265]; *First Nat. Bank* v. *Anderson*, 269 U.S. 341,

---

[2]None of the various other amendments to section 4a between 1933 and 1949 need be mentioned here. The material provisions appear in the section as it read in 1949: ''The rate of tax on National banking associations and other banks and financial corporations mentioned in Sections 1, 2, and 4 of this act, shall be a percentage equal to the percentage of the total amount of net income, allocable to this State, of every corporation taxable under subdivision (3) of Section 4 of this act, other than public utilities as defined in the Public Utilities Act, for the next preceding calendar year or fiscal years ended during such calendar year, required to be paid to this State as franchise taxes according to or measured by such net income, and required to be paid to this State or its political subdivisions by such corporations as personal property taxes during the preceding calendar year or fiscal years ended in such calendar year; provided, however, that said rate of tax shall not exceed 8 per-centum. The percentage of the net income of every corporation taxable under subdivision (3) of Section 4 of this act, other than public utilities as defined in the Public Utilities Act, required to be paid to this State or its political subdivisions in personal property taxes shall be determined by ascertaining the ratio which the total amount of such personal property taxes, less 4 percentum thereof, bears to the total amount of net income of such corporation, allocable to California, increased by the amount of such personal property taxes; provided, however, that if any such corporation sustains a net loss allocable to California the personal property taxes required to be paid by such corporation to this State or its political subdivisions during the preceding calendar year or fiscal years ended during such calendar year shall be considered for the purpose of determining such ratio only to the extent which such personal property taxes exceed such net loss allocable to California.

''The commissioner, after public hearing and opportunity given to examine the data on which his determination is based, shall determine not later than the thirty-first day of December of each year the average percentage of net income above specified, and, within thirty days after his determination, shall mail notice of his determination and the amount of tax payable on the basis of such determination to all banks and financial corporations affected thereby, which are then classified on his records as banks or financial corporations, but such determination shall not be considered a deficiency assessment within the meaning of Section 25 hereof. The data gathered by the commissioner in determining the rate, referred to herein, shall be made available to the taxpayers affected by such determination at the time and in the manner prescribed by regulations adopted by the commissioner.

''If it be judicially determined that the rate of tax on any bank or corporation is higher than is authorized by law such bank or corporation shall be relieved of liability for any tax imposed by this act only to the extent of the excess beyond that legally authorized.'' [Stats. 1949, ch. 1542, pp. 2736, 2737.]

347 [46 S.Ct. 135, 70 L.Ed. 295].) Section 5219 of the Revised Statutes of the United States (12 U.S.C. § 548) sets forth the four methods by which a state may tax those banks. The fourth method, which has been adopted by California, is to tax them "according to or measured by their net income." When this method is used, the "entire net income received from all sources" may be included, but the rate shall not be higher than the rate assessed upon other financial corporations "nor higher than the highest of the rates assessed by the taxing state upon mercantile, manufacturing, and business corporations doing business within its limits."

 It is settled that taxation of personal property, which is not a method of taxation permitted in section 5219, is improper. (*Owensboro Nat. Bank* v. *Owensboro,* 173 U.S. 664, 668 et seq. [19 S.Ct. 537, 43 L.Ed. 850] ; *First Nat. Bank* v. *City & County of San Francisco,* 129 Cal. 96, 97-98 [61 P. 778].) Plaintiffs contend that the California act imposes a tax rate higher than is permitted by section 5219 and that it results in taxing their personal property.

 Section 5219 is designed to allow the states considerable freedom in working out an equitable tax system, and the purpose of the limitation on the rate which may be imposed is only to prohibit discrimination in practical operation against national banks as a class. (*Tradesmens Nat. Bank* v. *Oklahoma Tax Com.,* 309 U.S. 560, 567-568 [60 S.Ct. 688, 84 L.Ed. 947].) In determining whether a state tax on such banks according to or measured by net income violates the limitation, consideration must be given to the state tax structure as a whole, not merely to taxes of the kind imposed upon those banks. The state tax on them is valid so long as the resulting burden does not exceed the burden to which state banks, mercantile, business, manufacturing, and financial corporations are subject. (*Tradesmens Nat. Bank* v. *Oklahoma Tax Com., supra,* 309 U.S. 560, 567-568; see *Franchise Tax Board* v. *Superior Court,* 36 Cal.2d 538, 551-552 [225 P.2d 905] ; *H.A.S. Loan Service, Inc.* v. *McColgan,* 21 Cal.2d 518, 520 [133 P.2d 391, 145 A.L.R. 349].) In *Tradesmens National Bank,* the court, in upholding the validity of a bank franchise tax against a claim of discrimination, took into consideration not only franchise taxes imposed on nonfinancial corporations but also their income and ad valorem taxes.

 Section 4a is designed to impose on banks a fair and equitable tax within the restrictions of section 5219, and the lack of any discrimination against banks is clear when the

entire tax burden of other corporations is taken into consideration. (See 22 Cal.L.Rev. 499, 503-504 (1934).) As we have seen, nonfinancial corporations as well as banks pay a franchise tax of 4 per cent of their net incomes and real property taxes, and the nonfinancial corporations also pay personal property taxes. ■ Banks are exempt from personal property taxes, and, while they pay as a franchise tax a percentage of net income in addition to the 4 per cent they pay in common with other corporations, the additional percentage is based on the ratio between the personal property taxes paid by the other corporations and the net incomes of those corporations.[3] The total percentage of net income paid by banks as franchise taxes is equal to the percentage paid by nonfinancial corporations as a group from their combined net incomes as franchise taxes and personal property taxes. Thus, if the banks are required to pay a higher percentage of their net income than some of those corporations, there are necessarily others paying a greater portion of their net income than the banks pay. It is apparent that the tax burden of the banks is not "higher than the highest of the rates" imposed upon nonfinancial corporations and is in accord with section 5219.

■ The personal property of national banks, which, as pointed out above, is exempt from taxation, is not taxed either directly or indirectly by the provisions of section 4a. The amount of taxes paid by the banks under that section does not depend upon or vary in any way with the amount of personal property they own. The calculation of the tax rates does not take into account the personal property owned by banks as a class or that owned by particular banks, and the tax is measured by their income.

■ The fact that Congress has not permitted taxation of the personal property of banks does not mean that their tax burden should be less than that of other corporations but only that it may not be imposed in the form of a personal property tax. This is evident from section 5219 of the Revised Statutes, which permits taxation of banks at the "highest" rate assessed against nonfinancial corporations. ■ The Legislature, consistent with the federal statute, could have exempted from personal property taxes nonfinancial corporations as well as banks, imposed franchise taxes on both at the same rate, and thus denied national banks any monetary

---

[3]Section 4a of the act provides for adjustments in the computation of the additional percentage, but it is not claimed that these adjustments have any bearing on the questions before us.

advantage from their personal property exemption. The legislative determination that the amount of taxes to be paid by nonfinancial corporations should be obtained partly by personal property taxes and partly by franchise taxes does not prevent the state from placing an equal tax burden on national banks solely in the form of franchise taxes.

It has been held in an analogous situation that, although a state may not tax the franchise of a foreign corporation whose activities in the state constitute exclusively interstate commerce, a special tax at a rate equivalent to the franchise tax may be imposed on the foreign corporation in the form of a net income tax from which corporations paying the franchise tax are exempt. (*West Publishing Co.* v. *McColgan,* 27 Cal.2d 705, 707 et seq. [166 P.2d 861], aff'd 328 U.S. 823 [66 S.Ct. 1378, 90 L.Ed. 1603]; cf. *Northwestern States Portland Cement Co.* v. *Minnesota,* 358 U.S. 450, 457 et seq. [79 S.Ct. 357, 3 L.Ed.2d 421, 67 A.L.R.2d 1292] [Citing with approval and quoting from the West Publishing Co. case]; *Gregg Dyeing Co.* v. *Query,* 286 U.S. 472, 478 et seq. [52 S.Ct. 631, 76 L.Ed. 1232, 84 A.L.R. 831].) Similarly, the fact that a state may not apply its sales tax to sales of property in interstate commerce or outside the state does not prevent it from imposing a use tax, at the same rate, on use or storage in the state and exempting from that tax all property which has been previously subjected to the sales tax. (*Southern Pacific Co.* v. *Gallagher,* 306 U.S. 167, 171-172 [59 S.Ct. 389, 83 L.Ed. 586].) It is apparent that these cases go much further than we are required to go here since the taxes there under consideration were upheld even though the taxpayer was required to pay the same amount as if the tax from which he was exempt had been applied. The amount of tax the banks are required to pay is not the same as the amount they would have paid had their personal property been taxed; there is no relationship between the franchise tax imposed on them and the personal property they own.

Decisions relied upon by plaintiffs are distinguishable from the present cases because in all of them there was a relationship between the amount to be paid under the tax held invalid and the amount of property or income as to which the taxpayer was entitled to an exemption. Moreover, all these decisions differ from the cases before us in other significant respects. In *Missouri* v. *Gehner,* 281 U.S. 313 [50 S.Ct. 326, 74 L.Ed. 870], *National Life Ins. Co.* v. *United States,* 277 U.S. 508 [48 S.Ct. 591, 72 L.Ed. 968], and *Miller* v. *City of Milwaukee,*

272 U.S. 713 [47 S.Ct. 280, 71 L.Ed. 487], the exemption
which the invalid tax was held to infringe on, namely, an
exemption of governmental securities, was designed to favor
these securities over other property in the matter of taxation,
while the purpose of the exemption of national banks from
personal property taxes, as we have seen, is to prevent the
states from using this form of taxing banks, not to relieve them
from the duty of paying their share of the tax burden. (See
17 Cal.L.Rev. 456, 506-507 (1929).) In *Frick* v. *Pennsylvania*,
268 U.S. 473 [45 S.Ct. 603, 69 L.Ed. 1058, 42 A.L.R. 316],
where the tax was upon the transfer of property at death
measured by the amount of the decedent's property both within
and without the state, the measure of the tax was not reason-
ably related to the privilege taxed insofar as property outside
the state was included. ■ The measure of the tax here,
net income attributable to California, is, of course, reasonably
related to the privilege of engaging in the business of banking
in the state. The tax involved in *Miller* v. *Heilbron*, 58 Cal.
133, 140-141, resulted in placing a greater burden on stock-
holders of national banks than on stockholders of other cor-
porations.

■ Use of the personal property taxes and the net
incomes of nonfinancial corporations in the computation of
the bank tax rate does not result in a deprivation of due
process or equal protection. ■ It is obvious that in
establishing an equitable tax system and setting the rate for a
particular class of taxpayers, the Legislature may consider
the tax rates applicable to other classes in comparable situa-
tions. Section 5219 itself requires that in imposing taxes on
national banks according to net income the Legislature must
take into account the rates assessed upon nonfinancial cor-
porations. The use of taxes paid by one group of taxpayers
in order to establish a rate of tax for another group has been
upheld where, as here, the statutory scheme was reasonably
designed to obtain equality of tax burdens. (*Michigan Central
Railroad* v. *Powers*, 201 U.S. 245, 292 et seq. [26 S.Ct. 459,
50 L.Ed. 744]; *People* v. *Keith Railway Equipment Co.*, 70
Cal.App.2d 339, 351 et seq. [161 P.2d 244].) *Hoeper* v. *Tax
Commission*, 284 U.S. 206, 215 [52 S.Ct. 120, 76 L.Ed. 248,
78 A.L.R. 346], is readily distinguishable. Under the income
tax held invalid there, a husband was required to pay taxes
not only on his own income but also on the income of his wife
over which he had no control whereas under section 4a the

measure of the tax imposed upon a bank is the income of the bank, not the income of someone else.

The next question is whether plaintiffs were denied procedural due process because they were not permitted to examine certain documents which were considered by the Franchise Tax Commissioner in setting the bank tax rate.[4] The commissioner each year compiled information as to the net incomes and personal property taxes of nonfinancial corporations from their verified franchise tax returns, from audit adjustments dealing with additional assessments and abatements, and from other materials obtained from the corporations. The information was tabulated in statistical form, and transcripts of the returns were made which contained the property tax and net income figures with serial numbers instead of names being used to designate the corporations. Two reports containing a proposed tax rate were prepared, one showing an over-all computation and the other a computation by industrial groupings. At hearings held by the commissioner the banks were permitted to inspect the transcripts and the statistical material, and members of the commissioner's staff, having possession of the original returns, answered questions as to their contents so that the lists furnished plaintiffs could be checked for accuracy so far as this could be done without disclosing the names of the corporations. Since 1941 the banks have sought at every hearing to examine the original returns and other documents which would show the identity of the nonfinancial corporations. The commissioner has denied access to these materials on the ground that section 35 of the act prohibits such a disclosure.[5]

After the hearings the commissioner set the tax rates for banks and other financial corporations. The rates he adopted were the same as the proposed rates in all years except 1943 and 1945, when they were higher. For the years 1933-1941, the rates set were the maximums permitted under section 4a,

---

[4]Defendant, Franchise Tax Board, succeeded to the powers of the Franchise Tax Commissioner in 1950. (Stats. 1949, ch. 1188, p. 2108.)

[5]With certain exceptions not relevant here, section 35 provides: "(a) . . . it shall be unlawful for the commissioner, . . . to divulge or make known in any manner the amount of income or any particulars relating to the business affairs of the bank or corporation set forth or disclosed in any report or return required under this act; . . . Nothing herein shall be construed to prohibit the publication of statistics, so classified as to prevent the identification of particular reports or returns and the items thereof, or the publication of the percentage of dividends paid by any bank or corporation. . . . (b) Any offense against this section shall be a misdemeanor." [Stats. 1943, ch. 352, p. 1464.]

i.e., 6 per cent and 8 per cent. They varied between 5.9955 per cent and 7.89 per cent during the remaining years.

Material in addition to that given to plaintiffs at the hearings was made available to them at the trial. They were given information as to the names and addresses of the nonfinancial corporations, filing dates of the returns and private addresses of officers and directors. This was done in such a manner that plaintiffs would not be in a position to connect any of the corporations with the income information previously supplied under serial numbers. With respect to the personal property tax data used by the commissioner, an offer was made to provide, with certain exceptions, the names of the corporations together with the amount of tax each had paid.[6] This offer was rejected by plaintiffs. Defendant also offered on several occasions to comply with any other reasonable method of verification which might be proposed by plaintiffs, and as far as appears no request for production was refused where it could have been granted without violating section 35.

The question whether plaintiffs are entitled to inspect the original tax returns was before us in *Franchise Tax Board* v. *Superior Court*, 36 Cal.2d 538 [225 P.2d 905]. We there issued a writ prohibiting enforcement of a trial court order, entered in the refund actions for 1943, permitting plaintiffs to inspect parts of the original tax returns filed by approximately 25,000 corporations. In that case plaintiffs contended, as they do here, that, where the determination of the tax rate is delegated to an administrative official, due process requires that at some stage of the proceedings, either at the administrative or judicial level, the taxpayer be permitted to examine all the data upon which the tax rate is predicated, including the original tax returns. (36 Cal.2d at p. 544.)

The constitutional issue was treated at length in *Franchise Tax Board* v. *Superior Court, supra,* 36 Cal.2d 538, and it was resolved adversely to plaintiffs. The opinion pointed out that plaintiffs' position regarding due process was based on the erroneous assumption that in determining the tax rate the commissioner was acting quasi-judicially, whereas in fact

[6]This offer did not include figures for the years 1933-1936 because statistics for those years had not been preserved. Information as to corporations having net losses was also omitted from the offer since it would have enabled plaintiffs, if they considered it with other information available to them, to determine the amount of net loss of each corporation, in violation of section 35. According to defendant, the net-loss corporations ordinarily accounted for less than 1 per cent of the personal property taxes entering into the computations.

he was acting in a quasi-legislative capacity. It was stated: ''There is no constitutional requirement for any hearing in a quasi-legislative proceeding. 'Where a rule of conduct applies to more than a few people it is impracticable that every one should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule. If the result in this case had been reached as it might have been by the State's doubling the rate of taxation, no one would suggest that the Fourteenth Amendment was violated unless every person affected had been allowed an opportunity to raise his voice against it before the body entrusted by the state constitution with the power.' (*Bi-Metallic Inv. Co.* v. *State Board of Equalization*, 239 U.S. 441, 445 [36 S.Ct. 141, 60 L.Ed. 372 ].) . . . ▮▮▮ The banks argue that the tax returns lost whatever privileged status they may have had through their use by the commissioner 'against' the banks. . . . An agency performing [a quasi legislative] function does not legislate 'against' the taxpayer. . . . The proceedings were in no sense adverse. . . . [They] were subject to legislative control, if desired, through examination of the tax returns by one of its committees.'' (36 Cal.2d at pp. 548-551.)

There is no sound basis for concluding, as plaintiffs assert, that our decision of the constitutional issue related solely to the administrative hearing, not to the court actions. The inspection order of the trial court was entered in the 1943 refund actions, after the administrative hearing relating to that year had been concluded, and the contention of plaintiffs regarding due process was made with respect to the actions as well as to the hearing. The reasoning used by the court in rejecting that contention was equally applicable to both, and the writ we issued was to prohibit inspection of the original tax returns in the judicial proceedings. There was no reason to discuss the due process question unless the court intended to decide that withholding inspection in those proceedings would not affect the validity of the tax rate.

▮▮▮ It must be kept in mind that the denial of access to the original tax returns does not prevent plaintiffs from attacking the propriety of the rate. The nondisclosure pro-

visions of section 35 mean merely that plaintiffs "are confronted with the common situation wherein proof of alleged facts is rendered more difficult because of the existence of certain privileged communications, protected as such because underlying public interests and policies outweigh the convenience of a particular litigant." (*Franchise Tax Board* v. *Superior Court, supra,* 36 Cal.2d 538, 551.) Much material helpful to plaintiffs in determining the accuracy of the rate was made available to them at both the administrative hearings and the trial, and the only information withheld was such that it would have revealed to them, contrary to section 35, the amount of income or the business activities reported by named nonfinancial corporations. We are satisfied that plaintiffs received all the information they reasonably needed.

The cases of *Ohio Valley Water Co.* v. *Ben Avon Borough,* 253 U.S. 287 [40 S.Ct. 527, 64 L.Ed. 908], and *Ohio Bell Telephone Co.* v. *Public Utilities Com.,* 301 U.S. 292 [57 S.Ct. 724, 81 L.Ed. 1093], relied on by plaintiffs, are distinguishable. Each involved the regulation of rates of a single public utility, not, as here and in *Bi-Metallic Inv. Co.* v. *State Board of Equalization,* 239 U.S. 441 [36 S.Ct. 141, 60 L.Ed. 372], a tax determination applicable to numerous persons. The Ben Avon case held that where a utility claims confiscation will result from a rate order, the utility is entitled to a fair opportunity to submit that issue to a judicial tribunal for determination upon its own independent judgment. (But see discussion of subsequent federal cases in 4 Davis, Administrative Law Treatise (1958), § 29.09, pp. 163 et seq.) Plaintiffs in the present cases obtained an independent judicial determination as to the validity of the tax rates after a fair opportunity to present evidence in support of their position. In the Ohio Bell Telephone case the commission made a rate order, relying on statistics and trade journals which had not been received in evidence at the administrative hearing, and the utility was not advised of what had occurred until after the order was made. The judicial review which followed was limited to a consideration of the record before the commission, and the utility was never given an opportunity to rebut the evidence not in the record. In holding that the utility had been denied due process, the court recognized that a different question would have been presented if the commission's order had been subject to attack in an independent action (301 U.S. at p. 303), and the case is consistent with the proposition that evidence outside the record may be used so long as its use is made known

to the parties and they are given an opportunity to rebut it (see 2 Davis, Administrative Law Treatise (1958), § 15.12, pp. 415-416). In the present cases plaintiffs were informed of the material relied upon by the commissioner as discussed above, and thereafter they were given opportunities for reasonable verification of that material and for attacking the rates by introducing any relevant, nonprivileged evidence.

Plaintiffs assert that, in determining the amount of personal property taxes of nonfinancial corporations, the commissioner used figures not in accord with the provisions of section 4a. They point out that the commissioner accepted as conclusive the classification made by the assessing authorities as to whether property of nonfinancial corporations was realty or personalty. It was shown at the trial that trade fixtures and other real property of those corporations had been misclassified by some assessing authorities as personal property.

The amount of personal property taxes of nonfinancial corporations to be taken into consideration by the commissioner is described in section 4a as the amount "required to be paid" as personal property taxes. The commissioner has in effect construed the quoted language as referring to the amount which the assessing authorities have required to be paid rather than, as plaintiffs urge, the amount which the assessors should have required to be paid. The construction adopted by the commissioner is clearly reasonable. As we have seen, personal property taxes on nonfinancial corporations are taken into account for the purpose of achieving equality between those corporations and the banks, and the construction that results in considering the amounts assessors have required to be paid is in accord with that objective. Moreover, errors that may occur in assessments may be favorable to the banks as well as unfavorable. On the other hand, if plaintiffs' construction were adopted and the determinations made by the assessors were not conclusive, the administration of the bank tax would be extremely burdensome and would involve considerable duplication of the work of the assessors. The commissioner would not only be compelled to reclassify property but would also be subject to additional burdens such as reevaluation of the property and redetermination of exemptions. The Legislature could not have intended such a result. It should also be noted that the trial court found that the procedures used by the commissioner achieved a "rough approximation" of the rates which would have been imposed if no misclassification had occurred.

The inclusion of the personal property taxes paid by cooperatives in the computations of the commissioner resulted in higher bank tax rates than would otherwise have been applicable, and plaintiffs contend that those taxes should not have been included. They point out that under section 4a the personal property taxes paid by a corporation having a net loss may be included in the computations only to the extent those taxes exceed the amount of net loss, and they assert that, if the net income of cooperatives had been correctly calculated, every cooperative would have had a net loss in excess of its personal property taxes. ■■■ It is plaintiffs' position that cooperatives, in determining their net income, may deduct all operating expenses and are also, with respect to business done with members and done with nonmembers on a nonprofit basis, entitled to a deduction of the gross income under subdivisions (l) and (m) of section 8 of the act, which provide that cooperatives may deduct all income from such business.

The determination of net income of cooperatives is important primarily for the purpose of ascertaining the franchise tax which the cooperatives themselves must pay and only indirectly for the purpose of computing the bank tax rate. The method of calculation urged by plaintiffs would give cooperatives an unwarranted benefit closely akin to a double deduction because they would be entitled to deduct, in addition to gross income from membership and nonprofit business, all operating expenses, which would include those attributable to the production of that income. Thus cooperatives would always have a loss from their cooperative business in the amount that expenses were incurred in carrying on that business, and this loss would substantially, if not entirely, offset income from profit-making activities, which should be taxable. In the present cases the trial court found that under the method of calculation urged by plaintiffs all cooperatives would have net losses for the years in question.

The commissioner's method of calculating the income of cooperatives, on the other hand, has the sensible result of treating them, so far as they engaged in profit-making business, like any other corporation subject to the franchise tax. He treated the deduction permitted by subdivisions (l) and (m) of section 8 as the gross income from member and nonprofit business minus the expenses incurred in producing that income. This treatment led to the result that, as to member and nonprofit business, the cooperatives had no income or loss and that net income or loss depended upon the difference, if

any, between the gross income from activities with nonmembers on a profit basis and the business expenses allocable to the production of such income.

Even if it were assumed that the deduction permitted by subdivisions (*l*) and (m) of section 8 is the entire gross income from member and nonprofit business, the cooperatives, contrary to plaintiffs' position, would not be entitled to also deduct business expenses incurred in producing that income. Subdivision (d) of section 9 of the act provides that in computing net income no deduction shall be allowed for any "amount otherwise allowable as a deduction which is allocable to one or more classes of income not included in the measure of the tax imposed by this act." Application of this subdivision in calculating the net income of any cooperative will lead to the same result as is reached under the commissioner's method.

Plaintiffs assert that it is illegal to include in the measure of the tax income from exempt governmental securities. They do not dispute that a state may impose a franchise tax on banks measured by net income from all sources, including exempt governmental securities (*Tradesmens Nat. Bank.* v. *Oklahoma Tax Com.*, 309 U.S. 560, 564-567 [60 S.Ct. 688, 84 L.Ed. 947] ; *Pacific Co., Ltd.* v. *Johnson*, 212 Cal. 148, 154 et seq. [298 P. 489] [aff'd, *Pacific Co.* v. *Johnson*, 285 U.S. 480, 489 et seq. [52 S.Ct. 424, 76 L.Ed. 893]), but they contend that the California tax is one measured by gross rather than net income. It is obvious from the provisions of the act(e.g., §§ 4, 7 and 8) that there is no merit in this contention. Although *Rosemary Properties, Inc.* v. *McColgan*, 29 Cal.2d 677 [177 P.2d 757], and *Burton E. Green Inv. Co.* v. *McColgan*, 60 Cal.App.2d 224 [140 P.2d 451], interpret one provision of the act not involved here as referring to gross income, they expressly recognize that the tax is calculated on the basis of net income. (29 Cal.2d at p. 681; 60 Cal.App.2d at p. 231.)

The judgments are affirmed.

Schauer, J., Peters, J., White, J., Peek, J. pro tem.,* Draper, J. pro tem.,* and Tobriner, J. pro tem.,* concurred.

---

*Assigned by Chairman of Judicial Council.