UNITED STATES of America and Crocker National Bank, a National Banking Association, Plaintiffs,

v.

STATE BOARD OF EQUALIZATION, an agency of the State of California, an agent of the Cities, Cities and Counties, and Counties of California, an agent of the San Francisco Bay Area Rapid Transit District, and an agent of the Southern California Rapid Transit District, Defendant.

No. C–77–0786–CBR.

United States District Court,
N. D. California.

May 4, 1978.

G. William Hunter, U. S. Atty., John M. Youngquist, Asst. U. S. Atty., San Francisco, Cal., M. Carr Ferguson, John J. McCarthy, Attys., Tax Div., U. S. Dept. of Justice, Washington, D. C., for plaintiff United States of America.

Evelle J. Younger, Atty. Gen., Ernest P. Goodman, Asst. Atty. Gen., Philip M. Plant, Deputy Atty. Gen., San Francisco, Cal., for defendant.

Franklin C. Latcham, Prentiss Willson, Jr., Morrison & Foerster, San Francisco, Cal., for plaintiff Crocker National Bank.

## MEMORANDUM OF OPINION

RENFREW, District Judge.

The issue in this case is whether the 1969 temporary amendment to § 5219 of the Revised Statutes of the United States, 12 U.S.C. § 548, permitted California to impose its state and local sales taxes on sales of tangible personal property to national banks between December 24, 1969, and December 31, 1972.[1] Plaintiffs seek a declaration that these taxes were illegally imposed and that appropriate refunds should be granted to all national banks in California, as well as an order granting plaintiff Crocker National Bank ("Crocker") a refund in an amount to be determined in subsequent proceedings. Defendant opposes this prayer and asks for a declaration to the opposite effect. Each side agrees, and the Court finds, that there is no issue as to any material fact, and that judgment may be granted as a matter of law. Accordingly, cross-motions for summary judgment were filed, and arguments on the motions were heard on December 15, 1977. For the reasons set forth below, defendant's motion will be granted.

■ As an initial matter, defendant's argument that the action is barred by the Eleventh Amendment and the Tax Injunction Act, 28 U.S.C. § 1341, must be rejected. If the suit were brought by Crocker alone, these provisions would be more pertinent. But the law is clear that the Eleventh Amendment is no bar to suit by the United States against a state, even when monetary relief is sought on behalf of a private party who is joined as a plaintiff. *Dept. of Employment v. United States*, 385 U.S. 355, 358, 87 S.Ct. 464, 17 L.Ed.2d 414 (1966); *see Monaco v. Mississippi*, 292 U.S. 313, 328–329, 54 S.Ct. 745, 78 L.Ed. 1282 (1934). It is equally clear that § 1341 does not act as a restriction upon suits by the United States

to protect itself and its instrumentalities from unconstitutional state exactions. *Dept. of Employment v. United States, supra*, 385 U.S. at 358, 87 S.Ct. 464. Whether or not the time-honored constitutional tax immunity of national banks as federal instrumentalities is still the law today, *see Agricultural Bank v. Tax Comm'n*, 392 U.S. 339, 341, 88 S.Ct. 2173, 20 L.Ed.2d 1138 (1968), and whether or not Crocker should avoid the bar of § 1341 in its own right, *compare United States v. State Tax Commission*, 481 F.2d 963, 974–975 (1 Cir. 1973), *with Federal Reserve Bk. of Boston v. Commissioner of C. & T.*, 499 F.2d 60 (1 Cir. 1974), there is no doubt that it is properly joined as plaintiff with the United States when both assert the same claims. *United States v. State Tax Commission, supra*, 481 F.2d at 975 & n.14; *United States v. Arlington County, Commonwealth of Virginia*, 326 F.2d 929, 932–933 (4 Cir. 1964). *See also Moe v. Salish & Kootenai Tribes*, 425 U.S. 463, 474 n.13, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976).

## I. FACTUAL BACKGROUND

■ Resolution of the merits is purely a matter of statutory construction, and the relevant factual background consists of the legal structure of state and local taxation of national banks. In 1819, the United States Supreme Court held national banks constitutionally immune from state taxation. *McCulloch v. Maryland*, 17 U.S. 315, 4 Wheat. 316, 4 L.Ed. 579 (1819). Statutes waiving that immunity have, however, permitted some form of state taxation since 1864. Act of June 3, 1864, c. 106, § 41, 13 Stat. 111–112. Whether or not that constitutional immunity is applicable in the present state of the banking industry, it remains the law that states may tax national banks only as specifically permitted by Congress. *Agricultural Bank v. Tax*

---

1. In the complaint and in their proposed form of order, plaintiffs phrase the issue more generally, referring to all state and local sales and use taxes imposed on national banks during that period. Neither the complaint nor any other document on file with the Court names any specific tax, other than those described in

the text, as being improperly imposed. Defendant has affirmatively stated, without contradiction, that the only issue in the case concerns the sales tax on sales to national banks, and this order is accordingly limited to that question.

*Comm'n, supra,* 392 U.S. at 341–346, 88 S.Ct. 2173. The statute enumerating permissible forms of taxation originally enacted in 1864, was amended and reenacted as § 5219 of the Revised Statutes of the United States in 1868, and ultimately codified at 12 U.S.C. § 548. Real property owned by banks was subject to taxation from the outset. After the amendments of 1868, 1923, and 1926, the statute provided for four other methods: (1) a tax on shares of capital stock, (2) inclusion of dividends in the taxable income of shareholders, (3) taxation of the banks' net income, or (4) a tax measured by the banks' net income. *See* 12 U.S.C.A. § 548 (1957) (amended 1969) (hereinafter cited as "former § 5219"). With minor exceptions, the states were barred from adopting more than one of the permissible methods. 12 U.S.C.A. § 548(1)(a), *supra.*

In 1928, California adopted a constitutional amendment opting for the fourth, or franchise tax method, which was made generally applicable to all banks. Cal.Const. art. 13, § 16 (current version at Cal.Const. art. 13, § 27 (West Supp.1978)). In 1929, the legislature imposed and set the rate for the newly authorized tax in accordance with the limits set forth in 12 U.S.C.A. § 548(1)(c), *supra,* Stats. 1929, c. 13, p. 19 (current version at Cal.Rev. & Tax.Code §§ 23181, 23182, 23186 (West Supp.1978)). Both the constitution and the statute provided that the franchise tax was "in lieu of all other taxes and licenses, state, county and municipal, imposed upon [the] banks", with the exception of real property taxes. Cal.Const. art. 13, § 16, *supra,* Cal.Rev. & Tax.Code § 23182, *supra.* Banks were thus plainly immune from the sales tax enacted in 1933. But in 1938, the California Supreme Court ruled that the incidence of the tax was on the retailer, and that sales tax could accordingly be collected from sellers upon their sales of goods to national banks. *Western Lithograph Co. v. State Board of Equal.,* 11 Cal.2d 156, 78 P.2d 731 (1938). Under this theory, national banks were immune from tax on sales made by them as retailers. They were, however, obliged to collect use taxes from consumers of those goods and to pay the amounts collected to the state. Cal.State Board of Equalization, Reg. 1567 (1969) (current version at Cal. Adm.Code T. 18 § 1567 (1976)). *See United States v. Boyd,* 378 U.S. 39, 43, 84 S.Ct. 1518, 12 L.Ed.2d 713 (1964); *Bank of America Nat. Trust & S. Ass'n v. State Bd. of Eq.,* 209 Cal.App.2d 780, 26 Cal.Rptr. 348, 359–362 (1963).

Two decisions of the United States Supreme Court in the late 1960's generated dissatisfaction with this complex system of taxation and led to a major revision of § 5219. In *Agricultural Bank v. Tax Comm'n, supra,* the Court held that the incidence of the newly enacted Massachusetts sales tax was on the purchaser for purposes of federal immunity, and that sales tax was accordingly impermissible on sales of tangible personal property to national banks. 392 U.S. 339, 88 S.Ct. 2173. Shortly thereafter, the Court summarily affirmed a three-judge court decision enjoining Florida from collecting sales and use taxes on sales to national banks, intangible personal property taxes on mortgages held by those banks, and documentary stamp taxes on documents held by those banks. *Dickinson v. First National Bank of Homestead, Fla.,* 393 U.S. 409, 89 S.Ct. 685, 21 L.Ed.2d 634 (1969), *affirming* 291 F.Supp. 855 (N.D.Fla.1968). These holdings, involving taxes which were commonly imposed in 1969 but for the most part unknown in 1926, led to the enactment of Pub.L.No. 91–156, 83 Stat. 434 (1969) (hereinafter cited as Pub.L.No. 91–156). Congress thereby amended § 5219 to permit the states to treat national banks as state banks for purposes of taxation, effective January 1, 1972. § 2. The effective date was later extended to January 1, 1973. Act of December 22, 1971, § 4, Pub.L.No. 92–213, 85 Stat. 775. Between December 24, 1969, when the bill was signed into law, and December 31, 1972, a temporary amendment permitted the imposition of certain designated additional taxes including sales and use taxes on both domestic and out-of-state banks. § 1. Imposition of taxes in the interim period was, however, restricted by a saving provision, which reads as follows:

"(a) Except as provided in subsection (b) of this section, prior to January 1, 1973 [amended by the Act of Dec. 22, 1971, *supra*, to read January 1, 1973], no tax may be imposed on any class of banks by or under authority of any State legislation in effect prior to the enactment of this Act unless

"(1) the tax was imposed on that class of banks prior to the enactment of this Act, or

"(2) the imposition of the tax is authorized by affirmative action of the State legislature after the enactment of this Act.

"(b) The prohibition of subsection (a) of this section does not apply to

"(1) any sales tax or use tax complementary thereto,

\* \* \* \* \* \*

imposed by a State which does not impose a tax, or an increased rate of tax, in lieu thereof." Pub.L.No. 91–156, § 3.

In 1969, it appears to have been the view of the California legislature that none of this was relevant to the sales tax on sales to banks, since that tax was not a tax on the banks at all. Although several bills proposing a major overhaul of California bank tax laws were introduced between December 24, 1969, and January 1, 1973, none was enacted.[2] Nor was there any substantive change in the method of calculating the rate of the franchise tax pursuant to Cal. Rev. & Tax.Code § 23186. The state's understanding is reflected in a 1970 letter from defendant's assistant tax counsel stating that "[u]ntil [the] Legislature acts, federal law (P.L. 91–156) . . . will not affect Calif. taxes." Cal.Taxes (P–H) ¶ 21,-148.20 (1970).

On the other hand, the cases that provided the impetus for congressional action might also have suggested that the California sales tax on sales to banks could go the way of the Massachusetts and Florida taxes. If the tax were thus invalidated, its effectiveness after 1969 would of course depend on the application of Pub.L.No. 91–156, and possibly on legislative action. But the California tax differed from those of Massachusetts and Florida, and the question of its incidence was regarded as settled by 30 years of authority consistently and unambiguously holding that the incidence of the sales tax was on the retailer, both in cases involving federal immunity and in cases of purely state law. *See Diamond National v. State Equalization Bd.*, 425 U.S. 268, 269–270, 96 S.Ct. 1530, 47 L.Ed.2d 780 (1976) (Stevens, J., dissenting).

It was not until 1976 that the problem surfaced. In that year, the United States Supreme Court summarily reversed a California decision which had rejected a claim for refund of sales tax on sales to national banks for the year 1968. *Diamond National v. State Equalization Bd., supra*, 425 U.S. 268, 96 S.Ct. 1530, 47 L.Ed.2d 780. Citing *Agricultural Bank v. Tax Comm'n, supra*, 392 U.S. 339, 88 S.Ct. 2173, 20 L.Ed.2d 1138 the seven-justice majority simply stated that the incidence of the tax fell on the bank as purchaser. In response, California refunded the sales tax paid on sales to national banks before December 24, 1969. The permanent amendment to § 5219 authorized the tax imposed on sales made after December 31, 1972. And the temporary amendment would clearly authorize the imposition of tax in the interim period, provided the saving provision did not apply. On the theory that the California tax is a sales tax automatically applicable under § 3(b)(1) of Pub.L.No. 91–156, defendant has refused to make any refunds for purchases made after December 23, 1969. In this suit, plaintiffs challenge that action on the ground that California imposes an in-

---

**2.** Changes not relevant to this action were made in §§ 23181, 23182, and 23186 of the Revenue and Taxation Code in 1971, 1972, 1973, 1975, and 1977. In 1974, article 13, § 16, of the constitution was renumbered and amended to permit taxation of banks by any method permitted under federal law, if the legislature so provided by a two-thirds vote. The two-thirds requirement was reduced to a majority in 1976. Until the legislature acts, however, the tax is to be as provided in original § 16. Cal.Const. art. 13, § 27 (West Supp. 1978).

creased rate of tax in lieu of the sales tax. Thus, in plaintiffs' view, subsection (b) of the saving provision does not apply, and the bar of subsection (a) prevents imposition of the tax until January 1, 1973.

## II. *INTERPRETATION OF PUB.L.NO. 91–156, § 3*

Defendant concedes that no affirmative legislative action authorizing the sales tax has been taken, and that the tax, although unconstitutionally collected, was not "imposed" within the meaning of subsection (a)(1) prior to 1969. There is no dispute that between 1969 and 1973, banks in California paid franchise tax at a built-up rate consisting of the rate applicable to non-financial corporations (7 or 7.6%) plus an additional amount (roughly 4%) determined, with minor adjustments, by the ratio the personal property taxes paid by non-financial corporations bore to their net income in the preceding year. Cal.Rev. & Tax.Code § 23186 (West 1954) (amended 1971, 1972, 1973, 1977). The sole issue is whether that increased rate of tax was imposed "in lieu" of sales tax on sales to banks within the meaning of § 3(b) of Pub.L.No. 91–156.

### A. *Narrowing the Issue*

Plaintiffs' initial argument rests on a syllogism. According to the California Constitution and the Revenue and Taxation Code as they read in 1969, the franchise tax was imposed in lieu of all other taxes on banks except taxes on real property. Cal. Const. art. 13, § 16 (West 1954) (current version at art. 13, § 27 (West Supp.1978)); Cal.Rev. & Tax Code § 23182 (West 1954) (amended 1975). The sales tax on sales to banks is a tax on banks. Therefore, the franchise tax must be in lieu of sales tax on sales to banks. Unfortunately, the law. is not so clear. Plaintiffs' contention that the plain meaning rule bars interpretation of statutory language that appears unambiguous on superficial examination is in accord with neither federal nor state law. *Train v. Colorado Pub. Int. Research Group*, 426 U.S. 1, 9–10, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976); *Doyon, Ltd. v. Bristol Bay Native Corp.*, 569

F.2d 491, 493–495 (9 Cir. 1978); *County of Sacramento v. Hickman*, 66 Cal.2d 841, 59 Cal.Rptr. 609, 614 n.6, 428 P.2d 593 (1967); *Golden v. City of Oakland*, 49 Cal.App.3d 284, 122 Cal.Rptr. 400, 401–402 (1975). Moreover, it would be a very superficial examination indeed that failed to note the latent ambiguity arising from uncertainty as to the incidence of a sales tax. Assuming a uniform test of incidence, the sales tax can be a tax on banks in their capacity as purchasers or in their capacity as retailers, but not both. If the incidence is on the purchaser, the franchise tax is in lieu of the sales tax on sales to banks. If on the retailer, it is in lieu of the sales tax on sales by banks. *See F.R.B. of Boston v. Commissioner of C. & T. of Mass.*, 520 F.2d 221, 223 (1 Cir. 1975). Both cannot be true, and the choice between the two alternative constructions can only be made by reference to evidence other than the "plain language" of the statutes.

For the purpose of determining whether a tax affects a federally immune institution, the test for incidence must be a federal one. *Agricultural Bank v. Tax Comm'n, supra*, 392 U.S. at 347, 88 S.Ct. 2173. Since it is now clear that the incidence of the California sales tax is on the purchaser as a matter of federal law, *Diamond National v. State Equalization Bd., supra*, 425 U.S. 268, 96 S.Ct. 1530, 47 L.Ed.2d 780, California consumers could have been taxed on sales made by banks even before 1969. The sales tax newly authorized by Pub.L.No. 91–156, § 1, must thus have been the tax on sales to banks. The language in subsection (a) of the saving provision delaying imposition of the newly authorized taxes until January 1, 1973, must also have reference to sales tax on sales to banks, and the sales tax exempted from the delay by subsection (b) can only be the sales tax on sales to banks. Of course, this sales tax is exempted from the delay provision of § 3(a) only if the state imposes no tax "in lieu thereof." The construction of this phrase is also a matter of federal law. However, the uniform application of a federal test of incidence does not, as plaintiffs suggest, provide the answer.

■ Plaintiffs contend that subsection (b) bars the automatic imposition of any new taxes in a state which has an "in lieu" tax of the type authorized by § 5219 prior to 1969. Such an interpretation would seem to deprive the word "thereof" of its significance. If this were the intent of Congress, the last phrase of subsection (b) would more appropriately read "imposed by a State which does not impose an 'in lieu' tax on banks." Thus, Congress' choice of language implies that a closer inquiry into the in lieu tax is required, in order to determine whether it is actually imposed in lieu of the particular tax sought to be imposed automatically pursuant to subsection (b).

The legislative history of Pub.L.No. 91–156 reinforces this conclusion. A major concern in Congress was that a bill eliminating all restrictions on taxation of national banks would subject the banks to double taxation in states that had enacted built-up rates of tax to equalize the tax burden between national banks and state banks or between banks generally and non-financial corporations. Hearings on S. 2065, S. 2096, and H.R. 7491 before the Senate Comm. on Banking and Currency, 91st Cong., 1st Sess. 33, 35, 38–41, 43, 60–61 (1969); S.Rep.No. 91–530, 91st Cong., 1st Sess., 1969 U.S. Code Cong. & Admin.News, pp. 1594, 1599; id. at 1600, 1601 (individual views of Mr. Tower).

The saving provision was added to avoid this result, while at the same time "very firmly committing to the several States responsibility for their own tax policies." Conf.Rep.No. 91–728, 1969 U.S.Code Cong. & Admin.News, pp. 1601, 1602–1603.[3] Thus, although the states were free to select a congenial scheme for bank taxation, the saving provision was inserted to ensure that banks would not be the victims of accidental discrimination caused by the automatic imposition of new taxes that had already, in effect, been paid as part of a built-up tax. This policy would of course apply only to those specific new taxes that were in fact compensated for in the built-up rate. Most of the references to "in lieu taxation" in the legislative history reflect that understanding.[4] Accordingly, more than the mere existence of a built-up bank franchise tax rate is necessary to defeat automatic imposition of the sales tax pursuant to subsection (b). The issue is rather whether that tax was imposed in lieu of the sales tax on sales to banks, in particular.

## B. The Impact of State Law

■ The meaning of "in lieu thereof" in subsection (b) is a question of federal law, and the mere fact that a state fails to include a specific tax within the category of taxes in lieu of which a built-up rate is

---

3. This purpose was further described in a later report on a study by the Board of Governors of the Federal Reserve System undertaken pursuant to Pub.L.No. 91–156, § 4:

"Under the 1969 amendment, certain of the newly authorized taxes * * * could be applied to national banks more or less automatically prior to January 1, 1972. Others under certain circumstances required affirmative action by the State legislature to extend them to national banks. This requirement was designed to prevent undue burdens which might result if additional taxes previously applicable to other businesses were now applied automatically to national banks while all previous taxes on national banks continued without change. As indicated earlier, some States had imposed higher tax rates or made other adjustments in taxes on national banks or all banks, in an effort to equalize taxes among banks or between banks and other businesses. Affirmative legislative action was considered desirable to avoid impairing whatever equality had been achieved by these earlier adjustments." Staff

of Senate Comm. on Banking, Housing, and Urban Affairs, 92d Cong., 2d Sess., State and Local Taxation of Banks 13 (1972).

4. See Hearings, supra, at 41 (taxes "in lieu of personal property and sales taxes"), 43 (American Bankers Association proposal would permit any tax except, inter alia, taxes "in lieu of which" other taxes had been imposed), 54 (higher franchise tax rate " 'in lieu of' several taxes" to which banks are not subject), 58 (bill should exclude taxes for which the state has substituted another tax); S.Rep.No. 91–530, supra, 1969 U.S.Code Cong. & Admin.News at 1600 (new tax should not be imposed by a state which imposes an increased rate of tax "in lieu of such new tax") (individual views of Mr. Tower). Contra, Hearings, supra, at 51 (American Bankers Association proposal provides that if an in lieu tax is imposed, other taxes may not be levied) (statement of New York Superintendent of Banks on behalf of National Institute of Supervisors of Banks).

imposed is not necessarily conclusive. On the other hand, state law to the effect that a franchise tax is imposed in lieu of the specific tax in question for purposes analogous to those of the saving provision would powerfully support the same result for federal law. That is not, however, the case here. California law has always held, and even after *Diamond National v. State Equalization Bd., supra,* continues to hold, that the incidence of the sales tax is on the retailer for state law purposes. *See* p. 1034, *supra; Zerox Corp. v. County of Orange,* 66 Cal.App.3d 746, 136 Cal.Rptr. 583, 589–590 (1977). Thus, purchaser banks have no claim to the state in lieu tax exemption on sales made to them. *Western St. Bankcard v. City & Cty., San Fran.,* 19 Cal.3d 208, 137 Cal.Rptr. 183, 189, 561 P.2d 273 (1977).[5]

 Plaintiffs' argument that state law has been changed in the wake of *Diamond National v. State Equalization Bd., supra,* 425 U.S. 268, 96 S.Ct. 1530, 47 L.Ed.2d 780, simply ignores this recent authority.[6] Moreover, plaintiffs' logic fails to consider the effect of Pub.L.No. 91–156 on the relationship between state and federal law. California has certainly always attempted to conform its taxation of national banks to § 5219. In all probability, the state would have included the sales tax on sales to

banks among the taxes in lieu of which the franchise tax was imposed if former § 5219 had still been the law when *Diamond National* was decided. But California in fact did not so include sales tax on sales to banks prior to *Diamond National,* and after *Diamond National,* the permanent amendment to § 5219 was already in effect. Under the broad authority of that statute, the sales tax was impermissible without regard to its incidence, and there was no reason for California to revise the state law of incidence or of in lieu taxation to conform to former § 5219.

### C. Federal Law

 What remains to be determined is whether federal law calls for a different result than that reached by the state. After careful consideration of the language and policy of the saving provision as applied to California's scheme for taxation of banks, the Court concludes that Congress did not intend to bar the automatic imposition of sales tax in the circumstances presented here.

 The legislative history is clear that the saving provision was designed to prevent unintended double taxation of banks in states that had attempted to equalize the tax burden by means of in lieu taxation.[7]

---

5. *Thomas v. Department of Motor Vehicles,* 59 Cal.App.3d 731, 131 Cal.Rptr. 164, 170 (1976), is not to the contrary. The Court of Appeal held there that California motor vehicle taxes could not be imposed under § 3(b) of Pub.L.No. 91–156, because the bank franchise tax was imposed in lieu thereof. The motor vehicle tax, unlike the sales tax on sales to banks, was unquestionably a tax on the banks themselves.

6. Since counsel for plaintiffs represented respondent in the *Western St. Bankcard* case, and since counsel were made aware of both cases by defendant's citations, the failure even to discuss them is surprising. It is not, of course, a breach of any provision of the Code of Ethics, since the Code exempts an attorney from his duty to inform the Court of directly adverse authority when his adversary has done so. But it is surely an important element of responsible advocacy in a case of this magnitude for a lawyer to give the Court the benefit of his considered judgment as to why apparently controlling authority is inapplicable.

7. Much has been made of the fact that a representative of the American Bankers Association, while testifying before the Senate Committee on Banking and Currency, referred to California as a state in which there was an "increased tax rate for banks based on income in lieu of personal property and sales taxes * * *." Hearings, *supra,* at 41. Similar mileage could be made of a later statement, annexed to the report on a study made by the Board of Governors of the Federal Reserve System, to the effect that it was expected that the franchise tax rate in Massachusetts and California would "be reduced administratively in recognition of the new additional taxes" authorized by Pub. L.No. 91–156, "such as sales and use taxes." Leland, "The History and Impact of Section 5219 on the Taxation of National Banks," Appendix 6 to State and Local Taxation of Banks, *supra,* note 3. Plaintiffs would interpret these statements to mean that Congress had California specifically in mind as a state where franchise tax was imposed in lieu of sales tax on sales to banks. Defendant counters that the

Where such taxes existed, affirmative legislative action was considered desirable "to avoid impairing whatever equality had been achieved by those earlier adjustments." State & Local Taxation of Banks, *supra,* note 3, at 13; *See also* S.Rep.No. 91–530, *supra,* 1969 U.S.Code Cong. & Admin.News at 1599. To bar automatic imposition of the sales tax here would in fact achieve precisely the opposite result: it would impair whatever equality had been achieved by disrupting the scheme consciously adopted by the California legislature with the goal of equalizing the tax burdens of banks and non-financial corporations within the limits of federal law.

The imposition of sales tax on sales to banks in addition to the built-up franchise tax was plainly a tax policy deliberately adopted by the California legislature. Sales tax on sales to banks was not, of course, a component in the formula for calculating the bank franchise tax rate. *See* p. 1034, *supra.* This is the predictable result of a formula designed to comply with former § 5219's requirement that the tax burden imposed on national banks be no greater than the burden imposed on non-financial corporations. 12 U.S.C.A. § 548(1)(c) (1957) (amended 1969); *Michigan Nat. Bank v. Michigan,* 365 U.S. 467, 472–475, 81 S.Ct. 659, 5 L.Ed.2d 710 (1961). The relevant taxes for inclusion in the formula were thus those paid by non-financial corporations but not by banks. Since the incidence of the sales tax was believed to be on the retailer prior to 1976, sales tax was being collected on sales to banks, as well as on sales to non-financial corporations. This burden, imposed equally on banks and non-financial corporations in proportion to their purchases, simply had no place in the formulation of an in lieu tax rate to equalize tax burdens.

We must assume, however, that the legislature was aware that the sales tax was being paid on sales to banks. Had the legislature known that the tax was in fact a tax on the purchaser under federal law, and that national banks were accordingly immune from tax on sales to them, the resulting inequality in tax burdens would have been a factor for consideration in setting the franchise tax rate. The appropriate response might well have been to incorporate the federal rule of incidence into California law. The franchise tax would then have been imposed in lieu of the sales tax on sales to banks, and the rate could have been adjusted upward to reflect the proportion such sales taxes bore to the net income of non-financial corporations. Such an upward adjustment would have been entirely proper, since neither the federal nor the state law governing taxation of national banks was designed to relieve banks from their fair share of the tax burden or to promote banking as an institution. Federal law merely governs the form in which taxes can be imposed in order to prevent discrimination against banks, and California adopted the prescribed forms in order to tax national banks at all. *Tradesmen's Bank v. Tax Comm'n,* 309 U.S. 560, 567–568, 60 S.Ct. 688, 84 L.Ed. 947 (1940); *Western St. Bankcard v. City & Cty., San Fran., supra,* 137 Cal.Rptr. at 187, 561 P.2d 273; *Security-First National Bank v. Franchise Tax Bd.,* 55 Cal.2d 407, 11 Cal.Rptr. 289, 292–293, 359 P.2d 625, *appeal dismissed,* 368 U.S. 3, 82 S.Ct. 15, 7 L.Ed.2d 16 (1961). California's method of calculating the in lieu rate was upheld over the banks' protest that the method led to higher taxes than would have resulted from direct imposition of personal property taxes. *Security-First National Bank v. Franchise Tax Bd., supra,* 11 Cal. Rptr. 289, 359 P.2d 625. The tax rate was found to be nondiscriminatory at a time

---

statements can have reference only to sales taxes on sales by banks, since it would be ridiculous to state that a franchise tax was imposed in lieu of a tax that was in fact being collected at the time the statements were made. Plaintiffs respond that it would be ridiculous to specifically mention the sales tax on sales by banks, which involved miniscule amounts of

revenue and was in any case recouped by compensatory use taxes imposed on consumers. Both parties are correct. The Court can only conclude that the statements, which make little sense on either interpretation contended for, reflect a superficial understanding of California law and should be given no weight in determining the intent of Congress.

when sales tax on sales to banks was also being imposed. If banks were no longer subjected to that tax, an additional rate increase in lieu thereof would have been authorized by the same reasoning.

Whether the legislature was reasonable in continuing to impose the sales tax on sales to banks after *Agricultural Bank v. Tax Comm'n, supra,* 392 U.S. 339, 88 S.Ct. 2173, 20 L.Ed.2d 1138, and whether it would in fact have made the adjustments necessary to equalize tax burdens if it had known that the sales tax on sales to banks was unconstitutional, are questions of no import under Pub.L.No. 91–156. What is absolutely clear is that the California legislature intended to impose both a built-up franchise tax and a sales tax on sales to banks, and that the built-up rate accordingly was not formulated, as it could properly have been, to compensate for the sales tax on sales to banks. Thus, there is no possibility whatever that the automatic imposition of sales tax pursuant to § 3(b) of Pub.L.No. 91–156 could have resulted in either unintended or double taxation. Invalidation of the tax for the years 1969 to 1973 would result in a plainly unintended windfall to banks in violation of the announced congressional policies of maintaining the equality achieved by state tax laws before 1969 and committing the responsibility for their own tax policies to the states.

Faced with these facts, plaintiffs cannot simply rely on the argument that Congress wanted the states to re-examine their tax structures and to take affirmative action if new taxes were to be imposed before 1973. That was clearly one of Congress' concerns. But it is equally clear that § 3(b) created an exception to that policy. The states were not required to undertake the meaningless, technical exercise of reenacting the common, non-discriminatory taxes enumerated in that subsection in order to make them applicable to national banks—provided only that the newly applicable taxes did not create an unintended double tax when added to existing built-up taxes. In California, where the sales tax on sales to banks had been collected for decades, it could be said with certainty that the imposition of that tax was neither unintentional nor duplicative. The banks had already had their day, both in the legislature and in court, to argue that the franchise tax rate was too high in light of the other tax burdens they bore, including the burden of sales tax reimbursement. The later shifting of the legal incidence of the sales tax did nothing to change those burdens, and added nothing to the banks' argument that their total tax burden was unfairly high. It would indeed be an exaltation of form over substance to hold that the legislature should have reenacted the sales tax in 1969 in order to make it applicable to transactions—sales to banks—to which it was and had always been assumed it applied and on which it was being and had always been collected. Congress did not intend to require any such formalistic result.

Accordingly, California did not, between 1969 and 1973, impose any tax in lieu of the sales tax on sales to banks within the meaning of Pub.L.No. 91–156, § 3(b). Since that tax was exempted by § 3(b) from the delay provision of § 3(a), it was legally imposed between December 24, 1969, and December 31, 1972, and no refunds can be granted.

### III. *ORDER*

For the reasons set forth above, IT IS HEREBY ORDERED that defendant's motion for summary judgment is granted, and plaintiffs' motion for summary judgment is denied.

IT IS HEREBY FURTHER ORDERED that counsel for defendant shall prepare an appropriate form of judgment, obtain the approval of counsel for plaintiffs as to form, and submit it to the Court for execution within ten (10) days of the date of this order.