[Sac. Nos. 6078, 6079, 6080. In Bank. Dec. 22, 1950.]

FRANCHISE TAX BOARD, etc., Petitioner, v. THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent.

Fred N. Howser, Attorney General, James E. Sabine, Irving H. Perluss, Edward Sumner and Ernest P. Goodman, Deputy Attorneys General, for Petitioner.

Sigvald Nielson, Albert J. Shults, Pillsbury, Madison & Sutro and Mitchell, Silberberg & Knupp, Amici Curiae on behalf of Petitioner.

O'Melveny & Myers, Louis W. Myers, Sidney H. Wall, Howard J. Deards, Pierce Works, Lawler, Felix & Hall and Brenton L. Metzler for Respondent and Real Parties in Interest.

EDMONDS, J.—The Bank and Corporation Franchise Tax Act (Stats. 1929, ch. 13, p. 19, as amended; Deering's Gen. Laws, Act 8488) provides that, with certain exceptions, it shall be unlawful for the Franchise Tax Commissioner to divulge any information concerning a tax return filed in accordance with the statute. In litigation challenging the validity of certain assessments made by the commissioner, the superior court ordered him to make available for inspection and copying the returns and related data filed by approximately 25,000 corporations. By this proceeding in prohibition, the Franchise Tax Board, as the statutory successor of the commissioner, is endeavoring to prevent the enforcement of those orders.

The Security-First National Bank of Los Angeles, Bank of America National Trust and Savings Association, and The Farmers and Merchants National Bank of Los Angeles brought separate actions for the refund of taxes paid by each of them under the Franchise Tax Act for the taxable year of 1943. The general theory upon which these actions are based is that the California plan of taxing banks and other financial

corporations either is unconstitutional as enacted by the Legislature, or as applied to their respective operations by the Franchise Tax Board.

Under the authority of section 5219 of the Revised Statutes (12 U.S.C. § 548), a state may tax a national bank according to, or measured by, its income from all sources, including that from tax exempt securities. California adopted this method of taxation in 1928. (Cal. Const., art. XIII, § 16.)

The Franchise Tax Act, *supra,* lays upon nonfinancial corporations a tax at a flat rate of 4 per cent of their respective net incomes. (§ 4, subd. 3.) National banks and other financial corporations are taxed at the same flat rate of 4 per cent of net income plus an additional percentage (not to exceed 8 per cent in all) derived from a ratio between the totaled personal property taxes paid by all nonfinancial corporations and their totaled net income for a given tax year. (§ 4a.)

Under this formula, although its personal property is not taxed, a bank may be required to pay a franchise tax at a rate proportionate to the personal property tax assessed against a nonfinancial corporation. The tax upon the bank's franchise, however, is in lieu of all other taxes and licenses, whether state, county or municipal, except taxes assessed upon its real property. There is no such provision for nonfinancial corporations; they may be required to pay personal property, sales and use taxes, and motor vehicle transportation and local licenses in addition to franchise and real property taxes.

In 1943, for the purpose of fixing the rate at which banks and financial corporations should be assessed for the taxable year of 1943, the commissioner conducted a hearing, and considered as evidence certain data compiled from the tax returns filed by nonfinancial corporations for the purpose of showing the amount of taxes paid by them upon their personal property. Thereafter, he determined that the banks and financial corporations should be taxed at the rate of 6.9 per cent of net income, which was an increase of .18 per cent over the rate fixed for the previous year.

The banks attack the evidence upon which the commissioner fixed the 1943 tax rate. By affidavits filed in support of their motions for leave to inspect (Code Civ. Proc., § 1000), they assert that substantially all of the evidence and information utilized by the commissioner as the basis for his determination consisted of franchise tax returns, claims for abatement and refund of taxes, unverified replies to demands for supplementary data and affidavits and evidence of diminution in net

income through war contract renegotiations. More specifically, the banks charge that the returns of the nonfinancial corporations include haphazard approximations in reporting allocations of net income, amounts accounted for as taxes upon real property which in fact were taxes upon personalty, payments to satisfy assessments upon personal property which later were held by the courts to be subject to refund, and other erroneous data.

In the actions for refund, the banks' attack upon the evidence received by the commissioner is essentially the same as that pressed at the hearing held for the purpose of fixing the tax rate. The banks then asserted that they had a right to examine and copy the reports and data of all nonfinancial corporations for the purpose of proving their contentions of inaccuracy. The commissioner refused the demand upon the ground that the Franchise Tax Act prohibits the disclosure of the information included in the tax returns. However, he agreed to receive any evidence which the banks might offer tending to prove that nonfinancial corporations had reported as taxes upon personal property amounts which had not been paid for that purpose. He permitted the banks to examine the various compilations upon which the rate was computed, and submitted data prepared by his office which purported to show for each of the 25,000 nonfinancial corporations the net income allocated to California, the amount of franchise tax, and the amount of taxes on personal property assessed against each corporation. In this list the corporations were identified only by serial number, not by name. Tabulations showing similar information regarding industries were made available to the banks. The commissioner also brought returns and other related documents into the hearing room and, when requested to do so by the banks, verified each item by reading it aloud from the returns and other documents. However, the identity of the particular taxpayer from whose return the commissioner read was uniformly withheld.

The orders of the superior court here under attack require the Franchise Tax Board to make the tax returns and related documents available to the banks for inspection and copying, subject only to the limitation that the board shall not be required to ". . . disclose or permit inspection of or the taking of copies of any figures or amounts expressed in terms of money and representing income gross or net (but not including deductions claimed from gross income) and returned or reported by individual and identifiable . . ." nonfinancial

corporations. The position of the board is that the superior court has exceeded its jurisdiction by issuing inspection orders contrary to the mandate of the Franchise Tax Act, which makes the disclosure of information included in a tax return a misdemeanor. As justifying the procedure invoked, it is argued that a writ of prohibition is the proper remedy because judicial action is threatened by the banks, and section 1000 of the Code of Civil Procedure specifies that one who refuses to comply with an order for the inspection of documents may be cited for contempt. There is no other plain, speedy and adequate remedy, says the board, because it must risk prosecution for contempt of court if it does not comply or be charged with having committed a misdemeanor if it makes the data available. These orders, it declares, are nonappealable and the disclosure of confidential information cannot be rectified by subsequent judicial action.

Upon the question of the banks' right to inspect the tax returns, the board insists that the orders issued by the superior court are invalid under both the tax statute and section 1881(5) of the Code of Civil Procedure, which forbids the examination of a public officer as to communications made to him in official confidence, when the public interest would suffer by the disclosure. The function of the commissioner in determining the tax rate is quasi legislative and need not meet all of the requirements of procedural due process. In the case of a hearing afforded by legislative grace, procedural due process does not require an examination of all the evidence, particularly where, as here, disclosure of tax returns is expressly forbidden. In any event, an adequate hearing was granted in that the banks were supplied with every item of information requested by them at the hearing, with the exception of the individual taxpayers' identity. No question of discrimination against national banks is involved because the tax levied upon them need only approximate the overall tax upon nonfinancial corporations. Finally, it is argued, the practical aspects of compliance with the orders are overwhelming. It would require the services of the entire auditing and clerical staff of the board for a period of 50 or more days merely to furnish the material ordered produced by the superior court. According to the board, many returns are in field offices, and the file for each corporation contains returns for many years. It is claimed that all other work of the board would have to cease pending the production of the approximately 25,000 returns.

The briefs of amici curiae in support of the board reiterate and further develop many of these contentions. The element of reliance by taxpayers upon the confidential treatment of their returns is stressed, and it is said that failure to recognize the full effect of the statutory requirement of nondisclosure would prompt taxpayers to withhold information which they believed readily could be obtained by their competitors in the event of a judicial proceeding. One amicus curiae insists that the general law concerning the right of privacy precludes disclosure of the contents of the returns.

In support of the challenged orders, the banks assert that at no stage of the tax proceedings have they had an opportunity to examine the returns which are the basis of the formula under which they have been assessed. It is contended that due process of law requires a full and fair hearing at some stage of the tax proceeding, which they were not afforded at the rate-making hearing. As the banks present the situation, the various compilations used by the commissioner and the portions of the tax returns, identified only by serial numbers, which were read to counsel, could not be challenged effectively because it was impossible to determine the relevancy of the individual tax returns upon which the rate was fixed. An examination of the tax returns will demonstrate, the banks insist, that they have been assessed upon the basis of data which includes inaccuracies, omissions and misrepresentations.

The right to see the returns is placed upon still another ground. Since the rate fixing hearing denied the banks an opportunity to examine the tax returns, they argue that due process of law requires that such opportunity be afforded during the refund litigation, which is the final stage of tax proceedings. It is asserted that due process requirements are offended by failure to permit examination of all the data upon which a tax rate is predicated, particularly where the determination of the exact rate is delegated by the Legislature. Furthermore, say the banks, the board's failure to deny the banks' allegations concerning the relevancy and materiality of the returns, as stated in the moving affidavits, supports the orders of inspection made under section 1000 of the Code of Civil Procedure.

As refuting the board's argument that section 35 of the Franchise Tax Act validly renders the tax returns privileged, the banks insist that such privilege is inconsistent with the requirements of due process and, under the express provisions of the statute, have no application to financial corporations.

It is insisted that, unlike the conventional privilege situation in which use of evidence is available to neither litigant or both, under the theory of the board the returns are available only to the taxing authorities. The banks contend that the returns lost whatever privileged character they may have possessed as to financial corporations when they were used "against" such taxpayers in determining their tax rate. Reliance is placed upon decisions holding that equal protection and due process of law are denied when secret and undisclosed evidence is used against a litigant or defendant.

The banks also stress their assertion that 98 per cent of the returns used in determining the tax rate had not been audited or checked in any way and contained much unreliable and inaccurate information. In support of their contention that the decision as to the tax rate was based upon inadequate evidence, they particularly refer to that part of the proceedings relating to renegotiations of government contracts. According to the record, prior to the hearing the commissioner had concluded that approximately 27 million dollars in income of certain nonfinancial corporations would be renegotiated and, by their returns or otherwise, other nonfinancial corporations had "indicated" that anticipated renegotiations would reduce their incomes by approximately 54 million dollars. The identity of the corporations was not disclosed to the banks. Such renegotiations, it is claimed, have reduced the income denominator as to nonfinancial corporations and thereby substantially increased the tax rate of the banks. The banks insist that they still do not know by what amount, if any, the income of the nonfinancial corporations was so reduced, and until such information is made available to them, there has been a denial of due process.

 Under the circumstances shown in this case, it is clear that the board is threatened with judicial action in the enforcement of the inspection orders either by citations for contempt or criminal prosecution. Moreover, there is no available remedy by way of appeal. (*Collins* v. *Corse*, 8 Cal.2d 123 [64 P.2d 137] ; *cf. Estate of Brady*, 32 Cal.2d 478 [196 P.2d 881].) If the superior court acted without or in excess of jurisdiction, prohibition is the only plain, speedy and adequate remedy available to the board.

The provisions of the Franchise Tax Act protecting tax returns against disclosure read as follows:

"*Except in accordance with proper judicial order in cases or actions instituted for the enforcement of the provisions of this act* or for the prosecution of violations of this act *and except as otherwise herein provided,* it shall be unlawful for the commissioner, any deputy, agent, clerk or other officer or employee, to divulge or make known in any manner the amount of income or any particulars relating to the business affairs of the bank or corporation set forth or disclosed in any report or return required under this act; provided, however, that such information may upon request of a committee appointed by either the Assembly or the Senate be furnished to such committee, but it shall be unlawful for such committee or any member, clerk or other officer or employee thereof to divulge or make known in any manner any particulars. . . . Nothing herein shall be construed to prohibit the publication of statistics, so classified as to prevent the identification of particular reports or returns and the items thereof. . . . (b) *Any offense against this section shall be a misdemeanor.* (c) Notwithstanding the provisions of subsection (a), the commissioner may permit the Commissioner of Internal Revenue of the United States . . . to inspect the returns. . . ." (Italics added.) (§ 35.)

█ The banks rely upon the language which excepts ". . . cases or actions instituted for the enforcement of the provisions of this act . . ." as the basis for their claim that they are entitled to examine the tax returns. They say that they are seeking to enforce the refund provisions of the act. But a taxpayer does not "enforce" a statute which levies a tax upon him. He may assert a claim for refund, as permitted by law, but in doing so he does not "enforce" the statute. A tax statute is enforced by the state or its representatives (see generally §§ 7051, 8251, 9251, 11651, 14740 and 16506 of the Revenue and Taxation Code) and the "cases or actions" mentioned in section 35 are those brought by the state. (*Cf. Bowman* v. *Montcalm Circuit Judge,* 129 Mich. 608 [89 N.W. 334].)

█ The banks also claim that the phrase ". . . except as otherwise herein provided . . .", contained in section 35, refers to the provisions of the Franchise Tax Act generally. Therefore, it is contended, section 4a is an exception to the prohibition of section 35, because the former provides for ". . . public hearing and opportunity given to examine the data on which his determination is based. . . ." An examination of "data" requires, the banks argue, the inspection of the

tax returns because it is upon them and related documents that the commissioner based the tax rate.

The language ". . . except as otherwise herein provided . . .", now found in section 35, was borrowed from section 33 of the Personal Income Tax Act (now § 19282 et seq. of the Revenue and Taxation Code) where this language was added in 1937. (Stats. 1937, ch. 668.) ▇ No doubt, section 35 of the Franchise Tax Act was amended in 1939 to include this language in order to give the returns of all taxpayers a privileged status by uniform provisions in all the statutes administered by the commissioner.

When the Personal Income Tax Act was codified in 1943, the words ". . . except as otherwise herein provided . . ." were used by the Legislature as a reference to the exceptions expressed in section 33 of that act. This fact is illustrated by the language of section 19282 of the Revenue and Taxation Code which reads: "Except as otherwise provided in this article . . ." certain conditions shall prevail. The article referred to contains the exceptions formerly included in section 33 of the Personal Income Tax Act.

As further evidence that the Legislature treated the language in question as a reference to the exceptions found in section 35 alone, it should be noted that section 26451 of the Revenue and Taxation Code, to become effective July 1, 1951, reads: "Except as otherwise provided in this article. . . ." (Stats. 1949, ch. 557.) "This article" (art. 2, ch. 15) contains only the exceptions formerly enumerated in section 35 of the Franchise Tax Act.

▇ Also, the construction of section 35 itself indicates the legislative intent that the exceptions referred to in the first sentence be those enumerated in the same section. The very next sentence, which is separated only by a semicolon, introduces the exceptions with the common term "provided, however." It seems logical to conclude that, where enumerated exclusions immediately follow the excepting clause, they are the only ones intended. Clearly, section 35 may not be read in conjunction with section 4a, because the former is complete within itself.

▇ However, even if it be assumed that the excepting clause of section 35 applies to the entire statute, section 4a does not require divulgence of the nonfinancial taxpayer's identity. The term "data" does not necessarily include the tax returns and related documents. The phrase "examine the

data" has been in section 4a since 1933; the excepting clause of section 35 was not added until 1939. As section 35, prior to 1939, expressly required the confidential treatment of returns and reports and did not include the phrase "except as otherwise herein provided," it is obvious that the "data" which the banks were permitted to examine under the authority of section 4a did not embrace the tax returns and reports made confidential by section 35. The commissioner, since 1933, and without legislative action changing the rule, has excluded tax returns from the "data" which he has made available for inspection. (*Coca-Cola Co.* v. *State Board of Equalization*, 25 Cal.2d 918 [156 P.2d 1].) Moreover, the general term "data" found in section 4a is controlled by the specific provisions against disclosure of tax returns stated in section 35.

The banks' contention that the board's refusal to permit them to examine and take copies of some 25,000 tax returns, identified as to the corporations filing them, amounts to a denial of procedural due process of law is based upon the erroneous assumption that the commissioner was acting quasi judicially. It is well established that a legislative body may delegate to a board or officer the discretion of carrying out a declared policy according to a prescribed test or standard. It is not necessary that the Legislature ". . . find for itself every fact upon which it desires to base legislative action or that it make for itself detailed determinations which it has declared to be prerequisite to the application of the legislative policy to particular facts and circumstances. . . . The essentials of the legislative function are the determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct. . . . These essentials are preserved when . . . [the legislative body] . . . has specified the basic conditions of fact upon whose existence or occurrence, ascertained from relevant data by a designated administrative agency, it directs that its statutory command shall be effective." (*Yakus* v. *United States*, 321 U.S. 414, 424-425 [64 S.Ct. 660, 88 L.Ed. 834]; accord *Bi-Metalic Inv. Co.* v. *State Board of Equalization*, 239 U.S. 441 [36 S.Ct. 141, 60 L.Ed. 372]; *Field & Co.* v. *Clark*, 143 U.S. 649 [12 S.Ct. 495, 36 L.Ed. 294].) Of interest in this connection is a part of the argument presented to this court. When asked whether the commissioner was exercising judicial or legislative functions, counsel for the banks replied ". . . I suppose that he has no quasi-judicial functions whatsoever. . . . I would say, yes,

under the holdings of this Court, that he is not acting judicially or quasi-judicially."

Where the proceedings are quasi legislative in character, a hearing of a judicial type is not required; a hearing allowed by legislative grace is not circumscribed by the restrictions applicable to judicial or quasi judicial adversary proceedings. (*Norwegian Nitrogen Products Co.* v. *United States,* 288 U.S. 294 [53 S.Ct. 350, 77 L.Ed. 796]; *Bi-Metalic Inv. Co.* v. *State Board of Equalization, supra; Assigned Car Cases,* 274 U.S. 564 [47 S.Ct. 727, 71 L.Ed. 1204]; *Buttfield* v. *Stranahan,* 192 U.S. 470 [24 S.Ct. 349, 48 L.Ed. 525]; *Brown* v. *Winter,* 50 F.Supp. 804; *Ray* v. *Parker,* 15 Cal.2d 275 [101 P.2d 665].) The Legislature might have adopted a flat tax rate of 6.9 per cent. Instead of doing so, in section 4a of the Franchise Tax Act it specified the procedure to be followed by the commissioner in ascertaining the facts and computing the percentage which would be applicable in comparing the tax burdens upon banks and other corporations. Following the prescribed method of computation, the commissioner determined that the equalizing tax rate should be 6.9 per cent.

There is no constitutional requirement for any hearing in a quasi legislative proceeding. "Where a rule of conduct applies to more than a few people it is impracticable that every one should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule. If the result in this case had been reached as it might have been by the State's doubling the rate of taxation, no one would suggest that the Fourteenth Amendment was violated unless every person affected had been allowed an opportunity to raise his voice against it before the body entrusted by the state constitution with the power." (*Bi-Metalic Inv. Co.* v. *State Board of Equalization,* 239 U.S. 441, 445 [36 S.Ct. 141, 60 L.Ed. 372].)

However, despite the lack of necessity therefor, the Legislature, as a matter of grace, provided for a hearing and one was accorded the banks in compliance with the statutory provisions. The banks were given the opportunity to question witnesses, produce evidence, and consider all data relied upon

by the commissioner excepting the identity of the nonfinancial corporate taxpayers which is prohibited by section 35. Through the compilation of some 1,000 data sheets and by bringing individual returns into the hearing room and reading from them as requested, the commissioner adequately met the requirements of a permissive statutory hearing upon a legislative question.

■■■■ The banks contend that because they were not permitted to examine the tax returns and learn the identity of the individual taxpayer, they had no hearing at all. A similar complaint was made in *Norwegian Nitrogen Products Co.* v. *United States, supra* (quoted with approval in *Ray* v. *Parker, supra*), in which the court said: ''The decision of this case hinges upon our answer to the question whether the petitioner has been 'heard' in accordance with the statute. Does the requirement of a hearing mean that every producer or importer affected by a tariff may explore at will the data collected by the Commission as to the capital, the wages, the cost of material and manufacture, in the business of any other person similarly affected, and may cross-examine investigators and competitors upon the data thus laid bare?'' This rhetorical question was answered in the negative. So in the present case, the statute does not declare that the banks shall have an opportunity to produce whatever evidence and be heard to whatever extent they may desire. It permits a hearing within the prescribed limits, among which is the confidential status accorded the returns of nonfinancial corporate taxpayers.

It cannot be said that such restriction renders the statutory hearing a nullity. In substance, it is the argument of the banks that were it not for the privileged nature of the returns, they would be able to prove their case. To some degree, a litigant faces the same problems as to all privileged communications, and the necessity for secrecy regarding tax returns, which underlies the legislative action giving that protection to the taxpayer, is fully recognized in such cases as *In re Chatham Phenix National Bank & Trust Co.*, 53 N.Y.S. 2d 923, *In re Valecia Condensed Milk Co.*, 240 F. 310 [153 C.C.A. 236], and *In re Reid*, 155 F. 933.

■■■■ The banks argue that the tax returns lost whatever privileged status they may have had through their use by the commissioner ''against'' the banks. At the outset, it must be remembered that the determination of the tax rate for financial corporations generally was quasi legislative in nature. An agency performing such a function does not legislate

"against" the taxpayer. The returns were utilized to compile the data which the quasi legislative agency considered in determining the tax rate according to the formula prescribed by the Legislature. The proceedings were in no sense adverse. Under the act, the taxpayers were entitled to a hearing, which they received; the proceedings were subject to legislative control, if desired, through examination of the tax returns by one of its committees.

For this reason, decisions holding that the evidence must be available to both litigants or neither are inapplicable. *Olive Proration etc. Com.* v. *Agricultural Prorate Com.*, 17 Cal.2d 204 [109 P.2d 918], relied upon by the banks, is further distinguishable by the fact that it involved evidence which ". . . was secretly received by the commission after it had determined the issues presented by the petition to terminate." There was no privilege bar to the evidence in that case; the evil lay in the fact that a finding was based upon evidence of which the opposite party was not apprised. Here, the evidence upon which the rate was determined was the amount of taxes paid by nonfinancial corporations. The banks were fully informed as to those figures. They were permitted to examine the compilations upon which the rate was computed. Material was prepared showing for each of the 25,000 nonfinancial corporations the net income, the amount of franchise tax, and the amount of taxes on personal property assessed against each of them. Returns and other documents were used to verify the compilations in which individual taxpayers were identified by serial numbers. The tax rate was determined from those figures, which were available to the banks although the identity of various taxpayers was not disclosed. The commissioner agreed to receive any admissible evidence offered by the banks in proof of their contention that the returns were inaccurate, but he properly refused to disclose the identity of the individual nonfinancial taxpayers or make their returns available for inspection and copying. By his action, the banks are confronted with the common situation wherein proof of alleged facts is rendered more difficult because of the existence of certain privileged communications, protected as such because underlying public interests and policies outweigh the convenience of a particular litigant.

Much of the banks' argument has been directed to the unconstitutionality of the method of taxation prescribed by the Franchise Tax Act. It is firmly established that state taxation of national banks at an approximate equivalent

rate to that applied through all taxes on nonfinancial corporations is a valid and constitutional procedure. (*International Harvester Co.* v. *Evatt*, 329 U.S. 416 [67 S.Ct. 444, 91 L.Ed. 390] ; *Tradesmens National Bank* v. *Oklahoma Tax Comm.*, 309 U.S. 560 [60 S.Ct. 688, 84 L.Ed. 947].) The question is of doubtful relevance in this proceeding. It concerns the narrow question of the validity of section 35 of the act, not the constitutionality of the entire plan of taxation.

The banks have requested that they be permitted to introduce a transcript of the hearing and a letter concerning the computation of the tax rate. The asserted relevance of this additional evidence is that it will prove the use by the commissioner of incorrect data in determining the rate, his reliance upon hearsay information, and the consideration of secret evidence as conclusive. So much of that evidence as is relevant to the question as to the effect of section 35 and its validity, is available in the present record.

For the foregoing reasons, the writs of prohibition are granted, and the petition to produce additional evidence is denied.

Gibson, C. J., Shenk, J., Carter, J., Spence, J., and Bray, J. pro tem., concurred.

Schauer, J., concurred in the judgment.

Respondent's and Real Party's in Interest petition for a rehearing was denied January 18, 1951. Traynor, J., did not participate therein.