[No. B076158. Second Dist., Div. Three. Jan. 12, 1996.]

PACIFIC MUTUAL LIFE INSURANCE COMPANY et al., Plaintiffs and Respondents, v.
STATE BOARD OF EQUALIZATION, Defendant and Appellant.

1154

**COUNSEL**

Daniel E. Lungren, Attorney General, Carol H. Rehm, Jr., and David S. Chaney, Deputy Attorneys General, for Defendant and Appellant.

Seyfarth, Shaw, Fairweather & Geraldson, James H. Fleming and Ronald E. Gustafson for Plaintiffs and Respondents.

**OPINION**

**CROSKEY, J.**—Plaintiffs are certain life insurance companies who filed suit to challenge, on various grounds, the authority of the California State

Board of Equalization (the Board) to impose on them new insurance premiums tax rates for the years 1989 and 1990. Plaintiffs also challenge the method of calculation which the Board used to determine the new tax rates for those years.[1] The trial court determined the Board did have the authority to revise the insurance premiums tax rate previously set by the Legislature. The court also determined the revised tax rate imposed on plaintiffs by the Board for 1989 was properly calculated but the revised tax rate imposed for 1990 was not. On that basis, it determined the Board must refund substantial amounts of money to the plaintiffs for overpayment of taxes. The Board appeals from the portions of the judgment which (1) invalidated its 1990 revised tax rate, (2) ordered it to refund money to plaintiffs, and (3) determined that plaintiffs are entitled to recover their attorney fees.

Plaintiffs have cross-appealed. They contend (1) the section of the Revenue and Taxation Code under which the Board revised the insurance premiums tax rates (§ 12202.1) violates the California Constitution, and (2) the Board did not comply with section 12202.1 when it set the premiums tax rate for 1989.

We affirm the judgment in part and reverse it in part. Insofar as the judgment affirms the validity of Revenue and Taxation Code section 12202.1, the validity of the 1989 insurance premiums tax rate, and the invalidity of the 1990 insurance premiums tax rate, the judgment is affirmed. Insofar as it requires a refund to plaintiffs, rather than a remand to the Board for recalculation of the 1990 premiums tax rate, and awards plaintiffs attorney fees, the judgment is reversed.

## BACKGROUND OF THE CASE

Under article XIII, section 28, subdivision (b), of California's Constitution, "An annual tax is hereby imposed on each insurer doing busines in this state on the base [and] at the rates . . . [as] hereinafter specified." Subdivision (c) of section 28 sets out formulas for determining the basis of an insurer's annual tax on the premiums it collects. For insurers not transacting title insurance in California, "the 'basis of the annual tax' is, in respect to each year, the amount of gross premiums, less return premiums, received in such year by such insurer upon its business done in this state, other than premiums received for reinsurance and for ocean marine insurance." Subdivision (d) of section 28 provides that "The rate of the tax to be applied to the

---

[1] Plaintiffs are Pacific Mutual Life Insurance Company, Transamerica Assurance Company, Transamerica Life Insurance and Annuity Company, and Transamerica Occidental Life Insurance Company.

basis of the annual tax in respect to each year is 2.35 percent." Under subdivision (h) of section 28, the Board is the agency which assesses the taxes provided for in that section.

Subdivision (i) of section 28 of article XIII of the California Constitution addresses changes in insurance premiums tax rates. It provides: "The *Legislature*, a majority of all the members elected to each of the two houses voting in favor thereof, may by law change the rate or rates of taxes herein imposed upon insurers." (Italics added.) At the general election on November 8, 1988, the voters of California passed initiative legislation commonly known as Proposition 103 (Prop. 103). A provision in Prop. 103 provides for the enactment of new legislation in the Revenue and Taxation Code, specifically the above mentioned section 12202.1 of that code. Section 12202.1 provides that for certain years, the Board must adjust the insurance premiums tax rate.[2] Pursuant to section 12202.1's directive,[3] on January 10 and January 24, 1990, the Board conducted public hearings to fix the premiums tax rate for 1989. Thereafter, the Board set the premiums tax rate for 1989 at 2.37 percent, thereby raising it .02 percent. Likewise, on January 9 and January 24, 1991, the Board conducted public hearings to fix the premiums tax rate for 1990. Thereafter, the Board again raised the premiums tax rate, setting it at 2.46 percent for 1990.

All of the plaintiff insurance companies paid insurance premiums taxes for 1989 and for 1990 at the new rates set by the Board and then, pursuant to Revenue and Taxation Code section 12977 et seq., filed with the Board a claim for a refund in the amount of premium taxes paid for 1989 and 1990 in excess of the 2.35 percent rate set by section 28, subdivision (d) of article XIII of the California Constitution. In April 1991, the Board mailed notices to the plaintiffs that all of their claims for refunds were denied.

---

[2]"The objective of Proposition 103 was to roll back rates [paid by consumers] for many kinds of insurance by 20 percent from the levels in effect on November 8, 1987. Such a general reduction of premiums could result in the loss of revenues from the taxation of insurance premiums. . . . To prevent this possibility, Proposition 103 gave the State Board of Equalization power to raise the rate of the insurance premiums tax for a period of about two years." (*State Comp. Ins. Fund.* v. *State Bd. of Equalization* (1993) 14 Cal.App.4th 1295, 1298 [18 Cal.Rptr.2d 526].)

[3]Section 12202.1 states in relevant part: "[T]he gross premiums tax rate paid by insurers for any premiums collected between November 8, 1988 and January 1, 1991 shall be adjusted by the *Board of Equalization* in January of each year so that the gross premium tax revenues collected for each prior calendar year shall be sufficient to compensate for changes in such revenues, if any, including changes in anticipated revenues, arising from this act. In calculating the necessary adjustment, the Board of Equalization shall consider the growth in premiums in the most recent three year period, and the impact of general economic factors including, but not limited to, the inflation and interest rates." (Italics added.)

Thereafter, plaintiffs filed this suit. In it, they challenge the constitutionality of Revenue and Taxation Code section 12202.1, and they alternatively assert the Board misdetermined the new insurance premiums tax rates for 1989 and 1990. The trial court determined (1) section 12202.1 is constitutional; (2) the rate of tax calculated by the Board for 1989 is proper but the rate for 1990 is not; (3) the Board must refund to plaintiffs, with interest, the taxes they paid for 1990 which are in excess of the taxes they would have paid had the Board used the tax rate set out in the Constitution; and (4) the Board must pay plaintiffs' attorney fees. Each of the parties has appealed.

## CONTENTIONS ON APPEAL

In its appeal, the Board asserts (1) it properly calculated the insurance premiums tax rate for 1990, (2) if the rate for 1990 was not properly calculated, the trial court should have remanded the matter back to the Board for recalculation rather than ruling that plaintiffs are entitled to a refund, and (3) the trial court erred in awarding plaintiffs attorney fees.

In their cross-appeal, plaintiffs assert (1) Revenue and Taxation Code section 12202.1 is unconstitutional because it impermissibly delegates a legislative tax rate setting function to the Board and because its provisions are too vague, and (2) assuming section 12202.1 is constitutional, substantial evidence does not support the Board's calculations for the 1989 premium tax rate.

## DISCUSSION

### 1. *The Constitutionality of Revenue and Taxation Code Section 12202.1*

■ Plaintiffs' constitutional challenge was addressed and found wanting in *State Comp. Ins. Fund.* v. *State Bd. of Equalization, supra,* 14 Cal.App.4th 1295, where the court found Revenue and Taxation Code section 12202.1 to be a valid exercise of the People's initiative legislative powers. However, we wish to elaborate on one portion of that challenge—plaintiffs' assertion that section 12202.1's provisions are not specific enough.

Plaintiffs contend Revenue and Taxation Code section 12202.1 gives the Board too much discretion and not enough direction and guidance in setting an insurance premiums tax rate. Using requirements which plaintiffs assert should be in section 12202.1, like a "prescribed method of computation," a

"prescribed formula" and a "specific procedure," plaintiffs assert the section is too vague. We disagree.[4]

In *El Dorado Oil Works* v. *McColgan* (1950) 34 Cal.2d 731 [215 P.2d 4], the plaintiff sued the Franchise Tax Commissioner, contending the commissioner had improperly reallocated the amount of its net income attributable to business done in California. Plaintiff had used "as the basis for [its originally filed] returns, in computing the percentage of business done in California, the average which these five factors within the state—property, payroll, sales, purchases, and manufacturing costs—bore to the total of such factors within and without the state." (*Id.* at p. 734.) The commissioner rejected the returns and "made a reallocation on the basis of a formula consisting only of these three factors—property, payroll, and sales." (*Ibid.*) The applicable law provided that for the privilege of exercising its corporate franchise within the state, plaintiff was required to pay "a tax measured by 4 per cent of its net income earned during the preceding fiscal or calendar year . . . ." (*Id.* at p. 735.) If the entire business of the corporation was not done within California, ". . . the 'tax [would] be according to or measured by that portion thereof which is derived from business done within this State . . . determined by an allocation upon the basis of sales, purchases, expenses of manufacturer, pay roll, value and situs of tangible property, or by reference to these or other factors, or by such other method of allocation as is fairly calculated to assign to the State the portion of net income reasonably attributable to the business done within this State and to avoid subjecting the taxpayer to double taxation.' " (*Ibid.*)

The plaintiff in *El Dorado* argued that the commissioner was only entitled to use less than the five enumerated factors when ". . . the five-factor formula would not truly reflect the income-producing elements of the unitary business, and to that limited extent[,] the . . . Commissioner may exercise his discretion in the choice of a formula; [plaintiff further argued] that since the five designated factors were all applicable to plaintiff's business, it was improper to substitute another formula for the computation of its franchise tax . . . ." (*El Dorado Oil Works* v. *McColgan, supra,* 34 Cal.2d at pp.

---

[4]As a threshold matter, we note it is proper for a legislature (or the people by initiative process, as was done here) to enact a tax rate by enacting the rule which fixes the rate. " 'It may be laid down as a general proposition,' says the supreme court of the United States, 'that where a legislature enacts a specific rule for fixing a rate of taxation, by which rule the rate is mathematically deduced from facts and events occurring within the year and created without reference to the matter of that rate, there is no abdication of the legislative function, but, on the contrary, a direct legislative determination of the rate.' (*Michigan Cent. R. Co.* v. *Powers* [1906] 201 U.S. 245, 297 . . . .)" (*Gadd* v. *McGuire* (1924) 69 Cal.App. 347, 365 [231 P. 754].)

735-736.) The Supreme Court rejected plaintiff's position, saying: "[T]he broad language of the section indicates that the factors therein designated are suggestive, but not mandatory or exclusive, and that the commissioner is empowered in his discretion to choose such tax base for his formula allocation as will carry out the act's purpose to achieve a proper apportionment of business done within and without the state, and at the same time avoid double taxation." (*Id.* at p. 737.)

The factors to be considered by the Franchise Tax Board Commissioner in *El Dorado*, and the discretion which he was given in using them, indicate that directives to administrative agencies need not be hard and fast in order to be proper. We do not perceive the directives in the legislation which was approved in *El Dorado* to be significantly more detailed than those in Revenue and Taxation Code section 12202.1. Section 12202.1 sets out its purpose—adjustment of the insurance premiums tax rate "so that the gross premium tax revenues collected for [1989 and 1990] shall be sufficient to compensate for changes in such revenues, if any, including changes in anticipated revenues, arising from [Prop. 103]." Section 12202.1 also provides the factors which the Board should consider in setting the new tax rates, including "the growth in premiums in the most recent three year period, and the impact of general economic factors including, but not limited to, the inflation and interest rates."

Another Supreme Court case, *Franchise Tax Board* v. *Superior Court* (1950) 36 Cal.2d 538 [225 P.2d 905], is also instructive. In that case, banks sued for refund of taxes paid by them. They challenged the constitutionality of a statute which provided the taxing rate for financial and nonfinancial corporations. The statute provided for taxing nonfinancial corporations at a flat rate of 4 percent of their net incomes, and also provided that for financial corporations, the same 4 percent rate would be used but to it would be added "an additional percentage (not to exceed 8 per cent in all) derived from a ratio between the totaled personal property taxes paid by all nonfinancial corporations and their totaled net income for a given tax year." (*Id.* at p. 541.) The banks challenged this formula, contending it was unconstitutional per se, and as applied to them in that the Franchise Tax Commissioner had allegedly relied on unreliable information in calculating the taxes due, said information being the tax returns of the nonfinancial corporations. The banks sought to discover the tax returns and related data of the nonfinancial corporations. In part of its opinion, the Supreme Court said: "It is well established that a legislative body may delegate to a board or officer the discretion of carrying out a declared policy according to a prescribed test or standard. It is not necessary that the Legislature '. . . find for itself every

fact upon which it desires to base legislative action or that it make for itself detailed determinations which it has declared to bé prerequisite to the application of the legislative policy to particular facts and circumstances. . . . The essentials of the legislative function are the determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct. . . . These essentials are preserved when . . . [the legislative body] . . . has specified the basic conditions of fact upon whose existence or occurrence, ascertained from relevant data by a designated administrative agency, it directs that its statutory command shall be effective.' (*Yakus* v. *United States* [1944] 321 U. S. 414, 424-425 . . . ; [citations].)" (*Franchise Tax Board* v. *Superior Court, supra,* 36 Cal.2d at p. 548.)

Plaintiffs reject application of *Franchise Tax Board* v. *Superior Court* and *El Dorado Oil Works* v. *McColgan* to this case because they contend that in those cases, the legislation challenged was not enacted to set a tax *rate* but rather dealt with establishing valuations and income. They argue "a tax rate determination is qualitatively different from a simple valuation determination" and setting a tax rate is a "more sensitive and pervasive task than determining value or income." Their contention is rejected out of hand. We find nothing "simple" about the formulas and factors which were to be applied by the Franchise Tax Board in those cases in determining the amount of taxes to be paid.

### 2. *The Validity of the 1989 and 1990 Tax Rates*

#### a. *Introduction*

■ Plaintiffs assert that even if Revenue and Taxation Code section 12202.1 is constitutional, the Board improperly calculated, and the trial court improperly approved, the premiums tax rate for 1989 because the method the Board used to calculate that rate is faulty. The Board asserts the trial court erred in determining the valuation method used by the Board to calculate the 1990 premiums tax rate was invalid. When the validity of a valuation method is reviewed to determine whether the method is arbitrary, in excess of discretion or in violation of standards prescribed by law, the issue is a question of law. (*ITT World Communications, Inc.* v. *County of Santa Clara* (1980) 101 Cal.App.3d 246, 252 [162 Cal.Rptr. 186].) We thus examine these matters de novo.

We note at the outset that one of the major challenges made by plaintiffs to the revised tax rates is their assertion that there was no decrease in the premium revenues collected by insurers in 1989 and 1990. Plaintiffs assert that because lawsuits by insurance companies held up the rollback provisions of Prop. 103, that initiative had no negative impact on the amount of

premiums taken in by insurers during the years mentioned in Revenue and Taxation Code section 12202.1 (1989 and 1990), and thus the premiums tax rate for those years should not have been adjusted by the Board. At the very least, our adoption of this analysis would give validity to a philosophy that if one wishes to avoid complying with legislation which involves definite periods of time, one should institute lawsuits which will remain pending past the statutorily set time for compliance. Further, by its terms, section 12202.1 requires a rate analysis if there are changes in *anticipated* tax revenues coming into the state. Thus, if it is true that changes in insurers' premium revenues did not occur because of their lawsuits, that does not necessarily mean that no rate adjustment should have occurred.

### b. *The Board's Methods of Calculating the New Insurance Premiums Tax Rates*

In anticipation of changes in the amount of premiums that insurers would collect after Prop. 103 passed, the Board sent them questionnaires regarding their premiums revenue income. It did this for both the 1989 and the 1990 adjustment. The Board's expert, Everett Anderson, who works at the Board as an administrator of environmental fees, testified at the trial.[5] Regarding the 1989 tax rate adjustment, he stated the questionnaire asked the insurers the amount of money they were actually collecting in premiums. The Board determined how much would have been collected had Prop. 103 not passed. Then the Board subtracted the former figure from the latter to determine the premiums revenue shortfall. Lastly, the Board divided "the loss of premiums revenue back over the actual base of revenue collections to get a new tax rate."

Anderson testified he looked at economic factors that seemed like they might influence premiums collections, and these included the ones specified

---

[5]Anderson stated he has a BA in accounting and has been with the Board since 1961. He was responsible for making recommendations to the Board regarding the adjustments in the premiums tax rate pursuant to Prop. 103.

Anderson testified Revenue and Taxation Code section 12202.1's directive to the Board was "a very difficult task, one that I would probably term [in the] next to the impossible range." He acknowledged that in his deposition, he had characterized the task as "impossible," but he explained that he had meant he did not think "there is anyone who could 100 percent accurately predict that outcome [i.e., anyone who could insure that the state did not lose any tax revenues because of Prop. 103]."

Anderson made it clear that the Board always felt, based on the statistics it looked at, that the premiums revenue growth rate would not go up as high for the insurance companies as it would have had Prop. 103 not passed, "so we're not talking about a decrease in total premiums revenue. We're talking about that it didn't go up quite as fast as it would have had Prop. 103 passed [*sic*]. That's why we recommended increasing the rate, but it in no way implied that total premiums income went down." Anderson stated that a large percentage of insurers "that would have been affected by Prop 103 responded [to the survey] saying, 'Yes, we did lose revenue because of Prop 103.'"

in Revenue and Taxation Code section 12202.1. His testimony shows the Board followed the directives in section 12202.1 to determine an adjusted premiums tax rate. Asked how he determined what premiums revenues the insurers would have collected absent Prop. 103, he stated he looked at the most recent three years' premiums and projected those figures, computing the rate of growth in between those years. He looked at other factors too, including population growth, interest rates and the consumer price index, in computing a new tax rate. Thus, the evidence shows the Board addressed the factors set out in section 12202.1 when it determined the premiums tax rate for 1989. This cannot be said for the tax rate it devised for 1990 premiums income; however, we disagree with most of the trial court's analysis regarding that tax rate.

The trial court enumerated several grounds for finding that the method used by the Board for computing the 1990 premiums tax rate did not comply with Revenue and Taxation Code section 12202.1. We find the evidence supports only one ground. Nevertheless, such a result still requires invalidation of the 1990 rate.

The trial court stated the method used by the Board "failed to take into consideration interest rates and the growth in premiums over the most recent three-year period. Revenue and Taxation Code section 12202.1 expressly requires the consideration of those two factors." We agree that section 12202.1 does expressly require the *consideration* of those two factors. The parties dispute what is meant by "consideration." Plaintiffs assert it means to actually *use* the factors in developing the method of calculation. The Board asserts the definition given for "consideration" in *Gonzales* v. *Interinsurance Exchange* (1978) 84 Cal.App.3d 58, 63 [148 Cal.Rptr. 282] applies. In *Gonzales*, the court looked to the Webster dictionary, saying: "*Consider* is 'to view attentively . . . to fix the mind on, with a view to careful examination; to think on with care; to ponder; to study; to meditate on. . . .' " The Board's definition seems more reasonable, since being required to actually use a specific factor in setting a rate could result in an erroneous rate. For example, Anderson testified he was able to find inverse correlation between premium rates and interest rates for short periods of time but "over a long period of time we felt [the interest rate factor] was unreliable in and of itself to make a prediction." In any event, the evidence shows that in setting the 1990 premiums tax rate, the Board did consider interest rates but it did not consider the growth in premiums in the most recent three-year period. Mr. Anderson himself acknowledged this. We reject the Board's contention that by using data supplied by the insurers in their survey forms, "the Board was not disregarding the statutory factors. Instead, the Board was looking at the

industry's data as a 'stand-in' for, or functional equivalent of, that data [*sic*]." The Board points to nothing in the record that shows information supplied to the Board by the insurance industry was the functional equivalent of the information regarding the growth in premiums for the most recent three-year period. Thus, because the Board did not consider one of the statutory factors set out in section 12002.1, the method used by it in computing the 1990 tax rate is invalid.[6]

3. *The Proper Remedy for the Board's Use of an Invalid Premium Tax Rate*

The trial court adjudged that plaintiffs should be refunded the taxes they paid for 1990 which are in excess of the 2.35 premiums tax rate provided for in article XIII, section 28 of the California Constitution, and should receive interest on said refunded amount. Such an adjudication has the effect of the trial court declaring that the proper premiums tax rate for 1990 was 2.35 percent. However, the trial court is not the body which Revenue and Taxation Code section 12202.1 directs to make that determination. Rather, it is the Board which is to determine the tax rate. Therefore, the trial court should have remanded the matter to the Board for reconsideration of the proper tax rate. (*Union Pacific Railroad Co.* v. *State Bd. of Equalization* (1991) 231 Cal.App.3d 983, 1001 [282 Cal.Rptr. 745].)

Plaintiffs assert the Board should have asked the trial court to remand and since it did not, the remedy is lost. We disagree. This "remedy" of remand was required by law. We also reject plaintiffs' contention that the Board's

---

[6]The trial court, in its statement of decision, also invalidated the 1990 method of calculation for the following reasons, neither of which is supported by the record or the requirements of Revenue and Taxation Code section 12202.1. The trial court stated the Board's method of determining the 1990 tax rate failed to take into consideration such things as claims cost inflation, changes in medical costs and costs of repairing cars and constructing homes. We reject this analysis because section 12202.1 does not specifically require consideration of such matters.

Additionally, the trial court declared the method used to calculate the 1990 premiums tax rate "rested on the unsupported assumption that Proposition 103 actually affected premium collections during 1990 and resulted in an inaccurate prediction that Proposition 103 affected premium tax revenues. In fact, the only evidence presented at trial concerning the effect, if any, of Proposition 103 on premium tax revenues showed that the refunds and rollbacks of premium rates contemplated by Proposition 103 did not occur in 1989 and 1990." This analysis ignores Anderson's testimony that the statistics he considered indicated that insurance companies' premiums growth rate did not go up as high as it would have had Prop. 103 not passed. Thus, while there may not have been a decrease in premiums revenue, there was a failure to increase as high as would have been expected had Prop 103 not passed. Further, Anderson testified that a large percentage of insurers, in their answers to the surveys the Board sent out, indicated they had lost revenue due to Prop. 103.

authority to set a rate for 1990 has expired by operation of law since plaintiffs' normal time for payment of the premiums tax for 1990 has passed. Plaintiffs' reliance on cases involving statutes which included their own repeal language does not support their contention. We also reject plaintiffs' reliance on Revenue and Taxation Code section 13102 et seq. This is not a case where it has been adjudged that plaintiffs paid too much in taxes; it has only been adjudged that the taxes paid were based on an improperly calculated premiums tax rate. For all we know, once the tax rate is properly calculated, it will be determined that plaintiffs actually paid too little taxes.

### 4. Validity of Trial Court's Award of Attorney Fees

■    The trial court justified awarding attorney fees to plaintiffs by saying the Board was not substantially justified in defending its 1990 premium tax rate and the plaintiffs "have substantially prevailed with respect to the amount in controversy and with respect to the most significant issues presented." Leaving aside the validity of this reasoning, the statute cited by the trial court does not support that award. The trial court cited Revenue and Taxation Code section 7156. However, the language in that section shows it only pertains to suits involving sales and use taxes.

Additionally, the trial court justified awarding attorney fees to plaintiffs under the private attorney general statute, Code of Civil Procedure section 1021.5, saying this suit "resulted in the enforcement of an important right affecting the public interest and conferred a significant benefit on a large class of persons." However, it has been repeatedly held that an award of attorney fees is not justified under section 1021.5 if the public benefit gained from the law suit (assuming arguendo there is such a benefit here) and the important public right enforced by the suit (assuming arguendo such a right was vindicated here) are coincidental to the plaintiff's personal monetary gain. (*Beach Colony II* v. *California Coastal Com.* (1985) 166 Cal.App.3d 106, 112-115 [212 Cal.Rptr. 485].) Here, plaintiffs collectively sought over $600,000 in refunds for 1989 and 1990 ($517,043 for 1990). They claimed attorney fees of $168,338 (assuming the reasonableness of this entire amount of fees claimed). Obviously, plaintiffs brought this suit for their own "strong personal economic interests." (*Id.* at p. 115.) Therefore, the attorney fees were not justified.

### DISPOSITION

The judgment is affirmed insofar as it (1) confirms the validity of Revenue and Taxation Code section 12202.1, (2) confirms the validity of the 1989 premiums tax rate, and (3) confirms the invalidity of the 1990 premiums tax rate. The judgment is reversed insofar as it (1) orders a refund to

plaintiffs of taxes paid in 1990 beyond those based on a rate of 2.35 percent and (2) awards attorney fees to plaintiffs. The cause is remanded for further proceedings consistent with the views expressed herein. Costs on appeal to the Board.

Klein, P. J., and Kitching, J., concurred.

Respondents' petition for review by the Supreme Court was denied May 1, 1996.